THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH FUELNER, Defendant-Appellant.

First District (4th Division)    No. 80-705

Opinion filed February 4, 1982.

Ralph Ruebner, Steven Clark, and Phillip J. Zisook, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joel A. Stein, and Raymond F. Brogan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Joseph Fuelner, was charged by information with kidnaping, aggravated kidnaping, rape, and armed violence (Ill. Rev. Stat. 1977, ch. 38, pars. 10—1, 10—2, 11—1, 33A—2). The jury found defendant not guilty of kidnaping and aggravating kidnaping, and guilty of rape and armed violence. Defendant was sentenced to two concurrent 30-year prison terms. He appeals.

The following issues are presented for review: (1) whether defendant was proved guilty beyond a reasonable doubt; (2) whether the trial court erred in allowing the State's witnesses to testify regarding their conversations with the complaining witness; (3) whether the trial court erred when it admitted testimony regarding the complainant's suicide attempt and 5-week hospitalization in a psychiatric ward; (4) whether the prose-

cutor's closing argument was prejudicial; (5) whether defendant received effective assistance of counsel; and (6) whether the trial court erred in entering judgments of conviction and imposing separate sentences for both rape and armed violence.

We reverse and remand for a new trial.

The complainant's testimony at trial included the following.

On June 4, 1979, the complaining witness was 20 years old. She lived with her 16-year-old sister, Sandra, in an apartment at Cicero and Laramie in Cicero, Illinois. The complainant worked as a bartender and book-keeper at the His and Mine lounge, also located at Cicero and Laramie. She had also tended bar for 2 days at the Eros tavern within the week of June 4, 1979.

The complaining witness stated that she had promised to drive Sandra to a boyfriend's house on the evening of June 4, 1979. She did not own a car and planned to borrow one from her employer. Shortly after 9:30 that evening, the complainant went to the Eros tavern located around the corner from her apartment. The bartender on duty was a woman named Chris. Joseph Fuelner, the defendant, was in the bar with a group of people. The complainant knew that defendant's name was Joe and that he was a trucker. She had seen him on two previous occasions: once in the Eros bar and once when he was coming out of that bar. On this occasion, June 4, she talked with defendant, who offered to buy her a drink, but she declined. Complainant stated that she was in the bar for about 40 minutes, leaving around 10:30 p.m. Defendant had left the bar about 5 minutes prior to her leaving.

After leaving the bar, the complaining witness began crossing an empty lot. When she had reached the middle of the lot, she turned around and saw defendant holding a gun. He took her by the arm, thereafter placing the gun in his pocket, and they proceeded to Laramie Street, a distance of 15 to 20 feet. He told her to get into a car—an old white Lincoln Continental with a rear view mirror on the dashboard. Defendant walked around the back of the car and entered on the driver's side. The complainant did not see the gun again until they were both in the car. Defendant drove south on Laramie and stopped at a gas station. He warned the complainant that his friend owned the station and that she should not "do anything stupid." Defendant got out of the car, laughed and talked with the attendant, and put gas in the car.

After driving away from the station, defendant repeatedly hit com-plainant lightly on the shoulder with the gun. He talked about his friends as he drove for 40 or 45 minutes. Defendant drove into an area where the complainant saw only trees and water at the sides of two hills. He told her not to move; he then got out of the car, leaving for 2 minutes. Defendant

returned to the car and then drove farther on. The complainant asked defendant why he displayed the gun. He said he was going to rape her. Eventually, defendant put the gun away but brought out a knife with a 9-or 10-inch blade. Defendant repeatedly threatened complainant and told her that he had a friend working for the Secretary of State who would "get him out of anything." He also warned her that if she complained he would rape her sister and then he would kill the complainant, for he did not want her to die until she knew that, because of her, her sister had been raped.

When the complainant told defendant that she needed air, he let her out of the car but held onto her left wrist. They walked to the top of the hill and then back to the car. Then, defendant threw complainant onto the car hood, hit her in the back of her head, and pulled down her pants. He touched her vagina and thereafter ordered her to go to the back of the car. Defendant opened the car trunk and removed a blanket and a jar of Vaseline. He then took the knife out of the car and placed the blanket on the ground behind the car. The complaining witness was told to lie down on the blanket on her back. Defendant put the knife on the ground and partially removed her lower garments. Thereafter, defendant returned to the car, knelt down and put on a condom. He then raped complainant. He took off the condom and threw it toward the nearby canal.

Defendant resumed talking to the complaining witness, saying that he was sorry, that he did not know what made him rape her, and that he had never done "anything like that." He said he would make it up to the complainant; he would teach her how to drive a truck. While complainant adjusted her clothing, defendant put the blanket and the Vaseline back in the car trunk and picked up the knife. They entered the car and drove from the scene. Moments later, defendant stopped the car, wiped off the knife and gun with a towel, and emptied the gun. He exited the car, threw the knife toward the canal and then threw the gun away, returned to the car, and drove off. He offered to drive the complaining witness home, but she asked to be let out at a nearby gas station.

At the gas station, while complainant was pacing back and forth, trying to decide whom she would telephone, a man drove up and asked her what was wrong. The complainant did not know the man and said nothing. Her hand was bleeding. The man said he would call the police but the complainant told him not to call. The man drove complainant to within four blocks of her apartment. Once in the apartment, she found a note from her sister, Sandra. At about 1 or 1:30 a.m., the complainant called Sandra and said that she was sorry she had not kept her promise to come back for her. When her sister asked the complainant whether she was alright, the complainant responded that she had been attacked,

almost raped, but that she was fine. Sandra inquired as to whether she had called the police; complainant responded that she was not going to call the police.

The complaining witness made another telephone call to Mickey, the sister of Sandra's boyfriend. The complainant wanted Mickey to allow Sandra to stay that night in her home. Complainant then sat down on her bed, fully clothed, and went to sleep.

The next morning, June 5, 1979, the complaining witness was awakened by her older sister, Debbie. The complainant babysat for Debbie from about 9 a.m. to 4 p.m. that day. The complainant then returned to her apartment. At about 10:10 that evening, the complainant revealed to her younger sister, Sandra, that she had been raped rather than attacked, and that she did not want to go to a doctor because the doctor would then have to involve the police. At approximately 10:30 p.m., the complainant talked with Debbie and told her that she could not see Debbie's son, Bobby, anymore because she (complainant) was "dirty." Debbie sent a cab to pick up the complaining witness. Some time later, complainant told Debbie that she had been attacked. The complainant did not want to go to the police because her attacker had threatened that her younger sister would be raped if she contacted the police. At about 2 a.m., June 6, the alleged rape was reported to the Cicero police.

At 9 a.m., June 6, the complainant returned to the police station to give a description of her assailant, in order that the composite sketch might be drawn of the attacker, and to attempt to locate the area where the rape incident occurred. On June 8, the complaining witness visited a physician who gave her a pelvic examination and prescriptions for antibiotics, valium and sleeping pills.

On June 12, 1979, the complainant was staying with an aunt. The telephone rang and complainant answered, but there was no response. Over defense objection, the complainant testified that she called the police and told them that she had been raped and that she thought the man who attacked her was in the house. She ran into the street, hysterical. That evening the complainant swallowed all of the sleeping pills and valium. Over defense objection, the complaining witness stated that she told her aunt that she was tired of living, that she could no longer stand jumping at shadows, that she could not walk to the store, and that she was paranoid. The complainant was taken to the hospital and was later transferred to the psychiatric ward of another hospital.

During her hospital stay, the complainant told her father that her assailant's name was Joe and that he was a truck driver. She had not told this to the police because of a fear of retaliation. In a photographic lineup on June 21, 1979, the complainant identified Joseph Fuelner as the man

who raped her. At trial, complainant identified photographs of defendant's car and the area where she was raped; she also identified the knife allegedly possessed by defendant at the time of the alleged rape.

On cross-examination, the complaining witness stated that on the evening of the incident, defendant's car was parked less than a block from the Eros bar. She further stated that when she first entered defendant's car she made no attempt to get out when defendant walked around to the other side; that during the 40 minutes in which defendant drove, she made no attempt to get out of the car; and that when defendant stopped the car on a dirt road about ½ to 1 city block away from a truck terminal, she made no attempt to flee. When defendant left the car for 2 minutes, the complainant made no attempt to escape. While defendant was driving, he kept the gun in his lap and would pick it up from time to time. The complainant said that she did not go back to the Eros that night nor did she discuss the incident with Christine McGuffey, the bartender at the Eros. The defense attorney also cross-examined the complainant concerning her suicide attempt and subsequent 5-week hospitalization.

The complainant's younger sister, Sandra, testified for the State. She stated that on June 4, 1979, the complaining witness intended to borrow a car to drive her to her boyfriend's house. When complainant did not return home, Sandra's boyfriend picked her up. Sandra left a note for her sister. In a telephone conversation with the complainant at 1 a.m., Sandra was told by the complainant that she was unable to borrow the car; that she had been attacked, but she was okay; that the incident took place near a canal; and that she had been saved by a man. According to Sandra, the complainant sounded quiet and withdrawn. At about 6 p.m. on June 5, the complainant revealed to Sandra that she actually had been raped. At that time, complainant seemed somewhat incoherent.

The complainant's older sister, Debbie, testified that on the morning of June 5, 1979, she drove to the complaining witness' apartment to pick her up. She found her sister sleeping, fully dressed. The complainant awakened and said that she had been attacked the night before but refused to go to a doctor and seemed to be in shock. Debbie drove complainant to her house. Complainant stayed there until Debbie returned around 3:40 p.m. and drove the complainant back to her apartment.

At about 10:15 that evening, the complainant called Debbie, telling her that she (complainant) had to go away. Debbie arranged for a cab to bring complainant to her house. The complainant began shaking and said, "Don't touch me. I'm dirty." An hour later, the complainant told Debbie that she had been raped. The complainant became hysterical, claiming she did not want to tell the police about the rape because the rapist would kill Sandra. Debbie went to her job where her employer called the

Berwyn police who referred them to the Cicero police. Complainant did not tell the Cicero police what had happened to her, but Debbie told them what her sister claimed had happened. Debbie and the complaining witness returned to the police station about 9 a.m. on June 6, 1979.

Joseph Bax of the Cicero police department testified that on June 6, 1979, at approximately 3:30 a.m., he received a message to go to the station to see a complainant. Bax met with complainant and her sister. The complainant stated that she had been raped. She was very disturbed, crying and shaking, but refused medical assistance.

Complainant's father, Joseph, a police officer for the Secretary of State, testified on behalf of the State. Over defense objection, he testified that on June 16 or 17, 1979, his daughter, Debbie, telephoned him saying that the complaining witness had been attacked and raped. On the next day, Joseph went to the hospital and talked with complainant for a few hours. She was upset, crying, and appeared frightened. Complainant told him that the man who attacked her would kill her and her sister, Sandra, if she mentioned the rape to anyone. Joseph assured his daughter that he would protect her and asked for a description of the offender. The defense objection to this conversation was overruled, but the court stated it would sustain any objection relative to any inquiry as to the details of the rape. According to Joseph, the complainant said that the offender's name was Joe, that he was a truck driver who drove a green and white truck, that he drove a 1964 or 1965 Lincoln Continental automobile, and that the rape occurred around 71st and Harlem Avenue. The witness stated that while conducting an investigation, he located a trucking company at 71st and Harlem that had green and white tractors. He later found a 1965 Lincoln Continental parked on the premises of the trucking company. After running a check on the license plate, he learned the car was registered to Joseph Fuelner.

Robert Biziarek, a Cicero police detective, was the next witness for the State. He testified that on June 21, 1979, he showed seven photographs to the complaining witness. The parties stipulated that complainant identified the defendant as the person who raped her on June 4. Over defense objection, Biziarek stated that after showing her the photographs, complainant began crying and shaking and then ran from the room.

Lawrence Cipowski, an investigator for the Secretary of State, testified that on June 27, 1979, he discovered a knife in a heavily wooded and brushed area during a "shoulder to shoulder search." On the previous day, another officer had discovered a prophylactic device in the area nearby.

Testimony by Albert Romito, an evidence technician, and Joseph Mortimer, a latent print examiner, established that a fingerprint of the complainant was recovered from the rear view mirror of defendant's car.

Dennis Maziecka, a physician, testified that on June 8, 1979, he met

the complaining witness at his office. Over defense objection, he stated that complainant's mother said that her daughter was raped on June 4, 1979. Maziecka gave complainant a general and vaginal examination. She seemed nervous and complained of insomnia. He prescribed valium, sleeping pills and penicillin.

Paul Suits was the first defense witness. He stated that he had known defendant for 2 years and the complaining witness for 1 year. On June 4, 1979, Suits saw defendant and complainant sitting together at the Eros bar around 10 p.m. Shortly afterwards, they left together. He saw them again after midnight when they returned to the Eros, sat down and had a drink. When Suits left 30 minutes later, defendant and complainant were still there.

The next defense witnesses were Robert Braun, Sr., James Jarocki, Robert Braun, Jr., Robert Lozau, Robert Kaczmarek, John LaRocco, Larry Howell and Donald Gary. They are truck drivers who worked for Arlington Trucking where defendant was employed. They had known defendant for several years and had met complainant when she was with defendant.

Braun, Sr., Braun, Jr., LaRocco and Howell all testified that they saw defendant and complainant together at the Arlington garage in mid-May 1979 and at a "hill climb" on June 1, 1979.

On June 1, 1979, Braun, Sr., first saw defendant and complainant around 6:30 that evening. Jarocki and Lozau saw defendant and complainant together only once in the middle of May 1979 at the Arlington garage.

Robert Kaczmerak met the complaining witness at the end of April or beginning of May 1979 at the Eros lounge. He was introduced to her by a friend. He saw complainant with defendant in a tavern in May, and at the Arlington garage and at the "hill climb" around the first of June. On cross-examination, Kaczmerak said that the "hill climb" took place on the second weekend in May.

LaRocco first met complainant at the Eros tavern in the middle of April 1979. He saw her two or three times thereafter in the Eros with defendant and another person.

Gary testified that he saw complainant and defendant together at the Eros lounge sometime in late May or early June. Complainant was in the bar when Gary and defendant arrived. When defendant began talking to complainant, she moved next to him. After an hour, Gary, defendant and complainant went in Gary's car to the location of the "hill climb." They remained there, drinking beer, for about 30 minutes. Gary drove defendant and complainant back to defendant's car.

Theodore Isaac, a construction worker, stated that he had met defendant and complaining witness in the Eros lounge. On June 4, 1979, he

saw both of them in the lounge. Isaac arrived at about 4:30 p.m., defendant arrived about 5:30 p.m., and complainant arrived at approximately 10 p.m. When complainant entered, she sat down next to defendant who bought her a drink. Defendant borrowed $5 from Isaac for gas and left with complainant at 10:30 or 10:45 p.m. He saw them together later that evening, around 12:30 a.m. They came back to the lounge together and sat together, each consuming a couple of drinks. When Isaac left at 1 a.m., complainant and defendant were still in the lounge.

Christine McGuffey, a bartender at the Eros, knew defendant as a customer and knew complainant as a co-worker and customer. On June 4, 1979, McGuffey saw defendant arrive around 5:30 p.m. and saw complainant arrive around 10 or 10:30 p.m. Complainant sat down next to defendant who paid for her drink. They left together around 10:30 or 10:45 p.m. and returned together about midnight and ordered drinks. Complainant asked McGuffey to accompany her to the restroom where complainant said that someone had tried to rape her at gunpoint; that she talked her attacker into putting the gun away, but then he pulled out a knife; that nothing happened and she got away; and that the incident occurred at the Berwyn theater. Complainant returned to the seat next to defendant. She seemed normal. When McGuffey left at 1 a.m., complainant and defendant were still in the lounge.

The State called several rebuttal witnesses. Bruce Kilborne, a neighbor, stated that about 6 p.m. on a Friday in late May or early June, complainant asked to borrow a suitcase for a weekend trip to Wisconsin. Complainant's mother testified that on Friday, June 1, 1979, at approximately 7 p.m., she received a telephone call from her daughter, the complainant, who said that she was going to Wisconsin for the weekend. Philip Delarosa picked up complainant about 9:30 p.m. on June 1 for the trip to Wisconsin. Cathy Hannigan saw complainant about 10 p.m. on June 1 at her home in Oak Park prior to leaving for Wisconsin.

The complaining witness was recalled and corroborated the testimony concerning her trip to Wisconsin. She denied going to Arlington Trucking Company on a Friday in mid-May with defendant and stated that she did not go to the area where the rape occurred on June 1, 1979, as alleged by defense witnesses. The State rested its case in rebuttal and then the defense rested. The jury found defendant not guilty of kidnaping and aggravated kidnaping and guilty of rape and armed violence. Defendant was sentenced to two concurrent 30-year terms.

Defendant complains that the trial court erred in allowing the State's witnesses to testify regarding their conversations with complainant. Sandra, complainant's younger sister, testified that at about 1 a.m. on June 5, 1979, complainant said that she had been attacked. Later that day, at about 6 p.m., complainant said that she had been raped. Debbie,

complainant's older sister, testified that when she woke complainant on the morning of June 5, complainant said she had been attacked. Later, at around midnight, complainant told Debbie she had been raped. Officer Bax of the Cicero police department testified that in the early morning hours of June 6, complainant said that she had been raped. Complainant's father stated that on June 16 or 17, his daughter, Debbie, told him complainant revealed that she had been raped. Upon visiting complainant in the hospital, complainant herself told him that her assailant had threatened her, that his name was Joe, that he drove a green and white truck and a 1964 or 1965 Lincoln Continental automobile, and that the incident occurred around 71st and Harlem Avenue. Maziecka, a physician, testified that complainant's mother told him her daughter had been raped on June 4.

Defendant contends that all of these preceding statements were inadmissible hearsay. The State contends the testimony of the victim's sisters was admissible either as spontaneous exclamations of the victim or as corroborative statements of the victim, and their testimony was not offered to prove the truth of the matter but to show the victim's emotional state and her disorientation resulting from the alleged rape, and to show why the victim hesitated naming her attacker. According to the State, the statements by the complainant's father were admissible to explain subsequent actions of the police in their investigations, and the physician's statement was admissible for purposes of medical treatment. Finally, the State argues that defendant waived any claim of error by failing to object to most of the statements at trial.

■■ Statements by a rape victim have been admitted where they came within either the spontaneous declaration or corroborative statement exceptions to the hearsay rule. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) The rationale of the spontaneous declaration exception is that the " 'utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him.' " (*People v. Damen* (1963), 28 Ill. 2d 464, 471.) Three factors are necessary to bring a statement within the spontaneous declaration exception: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Damen* (1963), 28 Ill. 2d 464, 471.) We hold that in the case at bar the statements of the complainant's sisters do not come within the spontaneous declaration exception because complainant had time to fabricate.

The basis for the corroborative statement exception is that it is

entirely natural that a rape victim would have spoken out regarding the rape, and the fact that she did not do so would be evidence of the fact that nothing occurred. (*People v. Damen* (1963), 28 Ill. 2d 464, 472.) Consequently, if proof of a complaint was not permitted, the trier of fact might assume that no complaint was made. To forestall this assumption, the prosecution is allowed to show that the alleged victim was not silent but made a complaint. (*People v. Damen* (1963), 28 Ill. 2d 464, 472.) The complaint must be promptly made, although there is no fixed or definite time limit, and the complaint must be made without inconsistent or unexplained delay. (*People v. Damen* (1963), 28 Ill. 2d 464, 473.) Delays have been viewed as consistent or explained where, during the delay, the complainants were incoherent, fearful, hysterical and/or emotional and, when they found a place or person lending them security, they made the charge as an outpouring of injury. (*People v. Houck* (1977), 50 Ill. App. 3d 274, 285, 365 N.E.2d 576, 584.) The complaint must be spontaneous and not made as a result of a series of questions to which answers were given. (*People v. Damen* (1963), 28 Ill. 2d 464, 473.) Only the fact of the complaint and not the details may be admitted, and the complainant must be a witness in the proceeding in which the statement is introduced. (*People v. Damen* (1963), 28 Ill. 2d 464, 473.) It is unnecessary to show details because the fact of the making of the complaint is sufficient to negate the presumption arising from silence. *People v. Damen* (1963), 28 Ill. 2d 464, 473.

■■ We hold that in the instant case the statements complained of do not meet the criteria of the corroborative statement exception. The victim did not make her complaint as soon as practicable. When the victim returned to her apartment she telephoned her younger sister and told her that she had been attacked but not raped. She made another telephone call that evening, and in the morning she told her older sister that she had been attacked, not raped. 'It was not until the evening of the day after the incident that the complaining witness revealed that she had been raped. This is not the type of delay for which Illinois courts have found statements admissible under the corroborative statement exception. See *People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285; *People v. Hood* (1974), 59 Ill. 2d 315, 319 N.E.2d 802; *People v. Slavin* (1978), 66 Ill. App. 3d 525, 383 N.E.2d 1303; *People v. Houck* (1977), 50 Ill. App. 3d 274, 365 N.E.2d 576; *People v. Bush* (1973), 11 Ill. App. 3d 31, 295 N.E.2d 548.

The State contends that complainant's statements to her father were admissible to explain subsequent police action. This argument has no merit, and the case cited by the State is not in point. In *People v. Egan* (1978), 65 Ill. App. 3d 501, 382 N.E.2d 477, a police officer testified that during the course of his investigation the defendant's mother said that the defendant was not at home. The testimony was admitted to show how the

officer conducted his investigation rather than for the truth of the matter asserted. The testimony reflected an investigatory procedure entirely within the officer's personal knowledge and its admission was proper. *People v. Egan* (1978), 65 Ill. App. 3d 501, 511.

■■ In the instant case, the complaining witness talked with her father because he was her parent and not because he was a police officer. The statements to her father were prior consistent statements which bolstered her testimony. As a general rule, it is error to allow a witness' testimony to be corroborated or bolstered by introducing a prior out-of-court statement of similar import, thus implying that the witness' court testimony is true because he told the same story on a previous occasion when he had no ulterior motive to do so. (*People v. Tidwell* (1980), 88 Ill. App. 3d 808, 810, 410 N.E.2d 1163, 1165.) There are two exceptions to this general rule. A prior consistent statement may be admitted to refute the charge that the in-court testimony is a recent fabrication, or, if it is contended that the witness has a positive motive to testify falsely, the statement may be introduced to show that the witness told the same story when no motive existed or could have been foreseen. (*People v. Tidwell* (1980), 88 Ill. App. 3d 808, 810-11.) The two exceptions do not apply in this case, because the prior consistent statements were introduced on direct examination. Therefore, the testimony of the victim's father repeating their conversation was inadmissible hearsay.

The State also argues that the physician's testimony was admissible because it was a statement adopted by the victim to her physician for purposes of medical treatment. The complainant's mother had told the physician that her daughter had been raped. Statements of presently existing bodily condition made by a patient to a doctor consulted for treatment are almost universally admitted as evidence of the facts stated. (*People v. Gant* (1974), 58 Ill. 2d 178, 186, 317 N.E.2d 564, 569.) This exception may be taken one step further to encompass statements made to a physician concerning the cause or the external source of the condition to be treated. (*People v. Gant* (1974), 58 Ill. 2d 178, 186.) But, here, the physician's statement does not fall within the exception because it was not made by the victim, but by the victim's mother. We hold, therefore, that the physician's statement was inadmissible hearsay.

■■ Another issue raised by defendant is that testimony regarding complainant's suicide attempt and her 5-week hospitalization in a psychiatric ward was irrelevant, unduly prejudicial and denied him a fair trial. The testimony was elicited from complainant, her father, and the treating physician. In *People v. Gillman* (1980), 91 Ill. App. 3d 53, 414 N.E.2d 240, the defendant was convicted of contributing to the sexual delinquency of a minor. At trial, the prosecution elicited testimony that the victim had undergone psychiatric treatment. The appellate court reversed, holding

that the testimony was irrelevant to the issue of the defendant's guilt or innocence of the charge and tended to prejudice the defendant and confuse the jury. (*People v. Gillman* (1980), 91 Ill. App. 3d 53, 60.) In our opinion, the testimony on the suicide attempt and 5-week hospitalization was irrelevant to defendant's guilt or innocence of the crime of rape and prejudiced the jury against defendant.

The State argues that defendant has waived these issues involving inadmissible and prejudicial evidence by failing to object at trial. However, the waiver rule is not absolute. (*People v. Jackson* (1981), 84 Ill. 2d 350, 359, 418 N.E.2d 739, 743.) Even in the absence of objection, substantial error may be considered if the error was so seriously prejudicial as to prevent the defendant from receiving a fair trial. (*People v. Jackson* (1981), 84 Ill. 2d 350, 359.) Before plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed. (*People v. Jackson* (1981), 84 Ill. 2d 350, 359.) Where the evidence is closely balanced, a court may consider errors that have not been properly preserved for review. *People v. Jackson* (1981), 84 Ill. 2d 350, 360.

■■ We regard the evidence in this case as closely balanced. The complaining witness testified that on the night of the incident she left the lounge after defendant did, but three witnesses for the defense testified that she left with the defendant and returned with him a few hours later. Apparently the jury did not believe complainant had been abducted at gunpoint, because they found defendant not guilty of kidnaping and aggravated kidnaping. Complainant identified the knife with which defendant threatened her, and her fingerprint was found in his car. But defense witnesses testified that defendant and complainant had been social companions and had been seen in the area where the alleged rape occurred some days and weeks prior to the incident. There was no medical evidence of a rape, and the complaint was made more than 24 hours after the incident. Initially, complainant stated that she had been attacked rather than raped. There were no witnesses to the offense, and the improper bolstering of the complaining witness' testimony so prejudiced the defendant before the jury as to deprive him of his right to a fair trial. *People v. Buckley* (1976), 43 Ill. App. 3d 53, 56, 356 N.E.2d 1113, 1115.

Accordingly, we hold that the conviction here must be reversed and the case remanded for a new trial in view of the cumulative errors. Because we reverse defendant's conviction and remand for a new trial, we need not consider the other issues raised by defendant.

Reversed and remanded.

LINN and JIGANTI, JJ., concur.