THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN C. KARMENZIND, Defendant-Appellant.

Third District   No. 3—90—0438

Opinion filed October 10, 1991.

GORMAN, J., dissenting.

Gary L. Morris, of Peoria, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (Judith Z. Kelly, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HAASE delivered the opinion of the court:

Defendant Melvin C. Karmenzind was charged with one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)). The complainant in the case is the defendant's son, C.K. The defendant pleaded not guilty, and his pretrial motion for a bill of particulars was denied. Tried before a jury, the defendant was found guilty. His two post-trial motions for a new trial were denied, and he was sentenced to 12 years' imprisonment. Defendant appeals his conviction. We reverse.

Prior to the start of the defendant's trial, Kelley Gott of the Illinois Department of Children and Family Services (DCFS) was examined in a *voir dire* proceeding to determine the propriety of admitting her testimony under section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10). The defendant's objection to the admission of this testimony was denied.

At trial, Elsie Buhs, C.K.'s baby-sitter, testified that on or about September 6, 1989, she drove C.K. to school and he commented that his father, the defendant "does drugs and climbs trees." Three hours later, Ms. Buhs returned to school to pick up C.K. and C.K. told her that the defendant had inserted a comb into C.K.'s rectum and his sexual organ into C.K.'s mouth. She also testified that C.K. told her that the defendant had done the same things to C.K.'s friend; that the defendant's friend Terry had also participated by using a screwdriver handle and "something like a hammer" to sodomize C.K.; that the

defendant had also used his sexual organ to sodomize C.K.; that the defendant had jumped on C.K., beaten him "around his private areas" and struck C.K.'s head against a wall.

On cross-examination, Ms. Buhs was unable to specify how many times she had discussed these allegations with C.K., but indicated that it "could have been" less than 10 times, but not more than one dozen times during the months of October through December 1989. She further testified that she had never observed the defendant mistreat C.K., that C.K. had blamed his father for a bruise on C.K.'s head and that C.K. had told lies to blame other people for his wrongs.

Ms. Gott of the DCFS testified that she held a videotaped interview with C.K. on September 19, 1989. She testified that C.K. told her about incidents involving a hammer and screwdriver. She further testified that C.K. told her that two incidents occurred when C.K. was two years old in Bartonville and Kingston Mines and C.K.'s friend and Terry were present at the alleged incidents, but Terry did not participate and fought with the defendant. Ms. Gott testified that C.K. used anatomically correct dolls to indicate various body parts involved and was only able to respond briefly to her questions.

During cross-examination, Ms. Gott clarified that C.K. did not discuss being sexually assaulted with anyone's sexual organ, as Ms. Buhs had testified. Ms. Gott further testified that every time C.K. answered a question, she repeated it and C.K. provided no narration and never gave more than a two- or three-word answer. Ms. Gott further clarified that according to C.K., the alleged incident occurred twice; once in Kingston Mines and once in Bartonville. Terry did not participate, and the fighting between the defendant and Terry occurred on only one occasion.

C.K. was questioned in a *voir dire* proceeding to determine his competence as a witness. He twice identified his last name as Melvin, once after being corrected by the prosecutor. Upon asking C.K. to define "telling the truth" and "telling a lie," C.K. repeated these two phrases back to the prosecutor. The prosecutor then indicated that it was the defendant's burden to prove that the witness was incompetent and tendered the witness to the defendant.

On cross-examination, C.K. identified his correct last name. He denied ever telling a lie. He indicated that he told the whole truth and not half-truths. C.K. first testified that he had only told Ms. Buhs and his mother about the alleged incidents. After prompting by defense counsel, C.K. recalled telling a police officer and a Mr. Minton, but denied telling any doctors. He reported only telling Ms. Buhs about the alleged incidents once, and telling his mother 10 times. He also

claimed to remember every event in his life back to the age of two, then denied this and reported that the alleged incidents took place when he was four years of age. The defendant objected to the qualification of C.K. as a competent witness. This objection was overruled.

Detective Steve Schmidt of the Peoria County sheriff's department testified next, again in a *voir dire* proceeding. He stated that he interviewed C.K. at his office on or about September 7, 1989. He also related testimony of his conversation with C.K. in which C.K. told him that the defendant and Terry had argued, that "they" used a screwdriver to sodomize him and that the incident took place in Kingston Mines.

On cross-examination, Detective Schmidt testified that he had spoken with the baby-sitter and C.K.'s mother on September 7 but that he did not interview C.K. until September 19, 1989, and that the interview lasted 15 or 20 minutes before C.K.'s interview with Ms. Gott. Detective Schmidt testified that during the first interview, the baby-sitter and the mother indicated that only a rattail comb and a man's sexual organ were alleged to have been used, but in the interview with C.K. a screwdriver, a hammer and a man's sexual organ were alleged to have been used. Detective Schmidt testified that he did not ask C.K. why his story had changed, but the changes were cause for some concern.

*Voir dire* was concluded and the jury returned. The first witness was C.K., who alleged for the first time that the defendant had used a wrench, in addition to a screwdriver and comb, to assault him. C.K. alleged that the comb broke when it was used, that this hurt him and that this happened only once; in the dining room at the house in Kingston Mines. C.K. also alleged that C.K.'s friend and Terry were there and for the first time alleged "the boss, Grandma Ruby" (Ruby Karmenzind, the defendant's mother), was there as well. C.K. testified that "Terry hurt C.K.'s friend" and that the defendant inserted his sexual organ into C.K.'s mouth and beat him.

C.K. indicated on anatomically correct dolls that the tools were inserted into his rectum. He also identified where the male sexual organ is located. Upon the prosecutor's request, C.K. drew pictures of himself and C.K.'s friend tied up in ropes. One of these pictures was admitted into evidence.

When asked, C.K. was unable to identify the defendant as his father. It is alleged, however, that this was the first time C.K. had ever seen his father clean-shaven, as the defendant had previously always worn a beard.

On cross-examination, C.K. denied ever changing his story, ever telling a lie or ever telling a lie to blame other people for his wrongs. He reported that his mother was the first person he told about the incidents. He testified that he then told his baby-sitter, then Officer Schmidt. After prompting, he recalled telling Mr. Minton and "a lady in front of a camera" and denied telling anyone that there were two separate incidents.

C.K. alleged that there was a single incident, that it took place at 10 a.m. and that a hammer, a wrench, a screwdriver and a comb with a handle were used. The defendant was the only one who did this to C.K., and the defendant and Terry took turns doing "the same thing" to C.K.'s friend.

C.K. denied that anyone fought over him and testified that the defendant had inserted his sex organ into his mouth and rectum. C.K. indicated one of several screwdrivers offered by the defense as being similar to the one used on him. C.K. also testified that he told his mother the entire story leaving nothing out, that he had told his mother that a wrench was used and that the defendant had inserted his sexual organ into C.K.'s mouth and rectum.

On redirect, C.K. asserted that he told the whole truth in his testimony and described Terry as having a mustache and peach-colored hair.

The next witness to testify was Detective Schmidt. He related details from the September 19, 1989, interview he had with C.K. Detective Schmidt testified that C.K. told him that his father had sodomized him with a screwdriver and a hammer at the house in Kingston Mines but that the "little part" of the screwdriver had been used rather than the "big part."

On redirect, Detective Schmidt testified that he had spoken with C.K.'s friend, but the subject matter and details of that conversation were not revealed.

Dr. Kurt Knochel, an emergency room physician resident at St. Francis Hospital, was the next witness to testify. He testified that he examined C.K. in the emergency room on September 6, 1989. He provided four quotes from C.K.: "my belly hurts," Daddy put his penis in my bottom," He put it in my mouth" and "Yes, his friend did the same things." Dr. Knochel testified that he thoroughly examined the child and found everything to be "entirely normal" and "no evidence of trauma."

On cross-examination, Dr. Knochel clarified that C.K. had said "my daddy's friend" had assaulted him, that he had found no indication of assault in his examinations, the screwdriver indicated by C.K.

may or may not have caused injury or scarring and his examination revealed no such scarring.

On redirect, Dr. Knochel revealed that C.K. had told him that these incidents had occurred "when it was cold but before Christmas" in 1987 or 1988. He further testified that "children sometimes complain of abdominal pain when there's something else going on."

The next witness was C.K.'s mother, Vickie Karmenzind. She testified that the defendant used to have longer hair, a full-face beard and a mustache. C.K. had never before seen his father clean-shaven. She also testified that from June 1987 to July 1989 C.K. periodically complained of constipation and stomach aches. Ms. Karmenzind testified that she once saw blood in his underwear when she was preparing him for his bath at a time of year when it was "kind of warm out." She testified that the defendant took C.K. to Kingston Mines to visit one of the defendant's friends, Terry Foust, during that time period.

Ms. Karmenzind testified that she learned of the allegations from Ms. Buhs and that she attempted to call an abuse hotline. She said that she used to have a rattail comb, but the defendant told her that "C.K. broke it and he threw it away." When she related this to Ms. Buhs, C.K. walked in, became hysterical and yelled "Dad broke the comb, I didn't break it."

On cross-examination, Ms. Karmenzind testified that she took C.K. to their family physician, Dr. Kabatay, after discovering blood in his underwear. She also testified that C.K. had told her bits and pieces of the allegations against the defendant, but never told her the whole story until the Friday before the trial. She denied discussing these allegations with Mr. Minton, Officer Schmidt or other people because "they already knew." When asked whether C.K. ever told a lie that she knew about, Ms. Karmenzind testified "I can always tell when he's telling a lie, because if you re-question him about it, then he'll switch his story."

The State rested and the defendant's motion for a directed verdict was denied. The defendant called Dr. Romeo Kabatay, the Karmenzind family physician, to the stand. Dr. Kabatay testified that he had treated C.K. for ear infections and an upper respiratory infection with diarrhea, but had never treated him or heard any complaint for constipation or rectal bleeding, despite seeing him in his office twice in 1987, five times in 1988 and twice in 1990. On cross-examination, Dr. Kabatay testified that he never examined C.K. for sexual abuse.

The next witness was Terry Foust. Mr. Foust denied any involvement in the incidents alleged by C.K. and denied ever meeting C.K.'s

friend. He denied ever having been involved in any incident with C.K., the defendant, C.K.'s friend or ever having molested C.K., C.K.'s friend or any other boy. On cross-examination Mr. Foust acknowledged that he had a moustache and that he had worn one for 10 years.

The next witness was Dr. Noor A. Khaiser, a gastroenterologist. He testified that he first saw C.K. on September 25, 1989, and performed a flexible sigmoidoscopy examination of the colon and rectum on September 27, 1989. The test revealed no trauma, scars, tears or healed ulceration. Dr. Khaiser testified that a screwdriver of the size indicated by C.K. would have caused some injury and perhaps scarring, no matter which end was inserted, but that the sharp end would have been more likely to cause severe injury of the rectal wall perforation.

The next witness was Dr. Phillip Immesoete, a geriatrician and pathologist. Dr. Immesoete was qualified as an expert witness in the field of medicine. Dr. Immesoete testified that "this size on this handle end [of the screwdriver] would cause a tear of the rectal sphincter" of a five-year-old child and that such a tear would leave a scar for over a year. He further indicated that any object this size, as well as the male sex organ, would dilate and tear the rectum of a five-year-old child. Dr. Immesoete testified that he had seen C.K.'s medical records and the sigmoidoscopy performed by Dr. Khaiser would have detected any internal trauma, tears or scars.

On cross-examination, Dr. Immesoete clarified that he had seen the emergency room report from St. Francis Hospital and two letters from Dr. Khaiser. He testified that he could not eliminate sexual abuse based on these reports and a child's mouth could be penetrated by a male sex organ and leave no evidence of trauma. Upon redirect examination he reasserted that an adult male sex organ or a screwdriver handle would leave trauma in the rectum of a five-year-old child.

Charles A. Phillips testified next. He testified that he is a longtime friend of the defendant. He testified that in November 1987, he found an orange-handled comb lying on the floor in the defendant's house; that he picked it up and laid it on the chair next to him, then on his own lap. When C.K. jumped into his lap, the comb gouged into C.K.'s seat. Mr. Phillips also testified that the defendant had a reputation for honesty and integrity in the community of Kingston Mines, that C.K. had been less than truthful on some occasions and that the defendant and Vickie Karmenzind had been rivals over their son. On

cross-examination Mr. Phillips stated that the comb was not broken in the November 1987 incident.

Karen Kilpatrick testified next. She testified about a conversation she had with Vickie Karmenzind during the summer of 1989 in which Vickie Karmenzind expressed concerns about the defendant's attempts to acquire visitation and custody rights regarding C.K.

Ruby Karmenzind testified next. Ruby Karmenzind related several past lies told by C.K., including "Mommy tied me up and threw me down the steps, down in the basement." She further testified that she was aware of C.K.'s medical problems, including ear infections, allergies and constipation. Ruby Karmenzind further testified that her family has a history of childhood constipation, including an incident where blood was passed with a bowel movement. On cross-examination, she denied being present at any of the alleged incidents and that she had not been concerned about Vickie's reports about C.K.'s constipation.

The defendant took the stand in his own defense. He said that he first heard of C.K.'s allegations "when Detective Schmidt confronted me on my doorstep" on or about September 12, 1989. The defendant testified that he denied these allegations on two separate occasions and again denied the allegations on the witness stand. The defendant confirmed the November 1987 incident with the comb as related by Mr. Phillips, but clarified that the handle had no point but "a real rounded end." He denied seeing Terry Foust molesting C.K.'s friend or using tools to sodomize him. He confirmed that he was seeking changes in visitation and custody for C.K. and denied both inserting his sex organ into C.K.'s mouth or seeing Terry insert his sex organ into C.K.'s mouth.

Following closing arguments, the jury retired to deliberate. The jury returned a verdict against the defendant and two post-trial motions for a new trial were denied. The defendant was subsequently sentenced to 12 years' imprisonment and now appeals, raising several issues on review.

Initially, the defendant contends that he was not proven guilty beyond a reasonable doubt. The defendant contends that the physical evidence in the case fails to corroborate C.K.'s testimony. Additionally, the defendant points to several contradictions in C.K.'s testimony as further evidence that he was wrongly convicted.

In *People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344, our supreme court mandated that the reasonable doubt test as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, be applied in reviewing the sufficiency of the evidence in all criminal

cases. We join recent decisions by the first district (*People v. Byrd* (1990), 206 Ill. App. 3d 996, 565 N.E.2d 176), fourth district (*People v. Evans* (1990), 199 Ill. App. 3d 330, 556 N.E.2d 904), and fifth district (*People v. Meador* (1991), 210 Ill. App. 3d 829) in holding that the proper standard of review in sex offense cases is the reasonable doubt test as announced in *People v. Collins*. Accordingly, it is not the function of this court to retry the defendant. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

■ The reasonable doubt test places a substantial burden upon the prosecution in criminal cases. It is the time-honored test that has been used in criminal cases throughout the history of American criminal jurisprudence. It is not gossamer or ethereal but involves real substance. Trial courts do not instruct juries on the meaning of "beyond a reasonable doubt." The term is defined in Black's Law Dictionary as "In evidence means fully satisfied, entirely convinced, satisfied to a moral certainty; and phrase is the equivalent of the words clear, precise and indubitable. In criminal case, the accused's guilt must be established 'beyond a reasonable doubt,' which means that facts proven must, by virtue of their probative force, establish guilt." (Black's Law Dictionary 147 (5th ed. 1979).) The term has been further defined as "Reasonable doubt which will justify acquittal is doubt based on reason and arising from evidence or lack of evidence, and it is doubt which reasonable man or woman might entertain, and it is not fanciful doubt, is not imagined doubt, and is not doubt that juror might conjure up to avoid performing unpleasant task or duty." *United States v. Johnson* (2d Cir. 1965), 343 F.2d 5, 5.

■ In applying the reasonable doubt test as announced in *Collins*, a reviewing court must decide whether the evidence viewed in the light most favorable to the prosecution could convince any rational trier of fact that the facts proven by virtue of their probative force established the guilt of the defendant.

■ After reviewing the evidence in the light most favorable to the prosecution, we conclude that the defendant's conviction must be reversed. The main evidence against the defendant was the testimony of his son, C.K. C.K. was between the age of two and four years old at the time of the alleged incident. He did not report the incident to anyone for between one and three years after the occurrence. His testimony was uncorroborated except to the extent that the various accounts he gave to other people were admitted under section 115—10

(Ill. Rev. Stat. 1989, ch. 38, par. 115—10). C.K.'s trial testimony differed in numerous ways from the other versions of his story that he had given to Ms. Buhs, Detective Schmidt, Dr. Knochel, his mother, and Kelly Gott. More importantly, the medical testimony did not establish that C.K. had been assaulted in the manner alleged. Although Dr. Knochel agreed there was a possibility these acts could occur without injury, it was his expert opinion that injury would occur. Both Dr. Khaiser and Dr. Immesoete testified that the insertion of either end of a screwdriver into a five-year-old's rectum would cause injury and trauma. Dr. Immesoete testified that any object of that size, including a male penis, would dilate and tear the rectum leaving a scar for over one year. The uncontradicted medical evidence established that there was no such injury or scarring of C.K.'s rectal area.

We are not unmindful of the serious problem in this State with child abuse. We are also well aware of the difficulties of proof involving sexual offenses on young children. However, the State still has the burden of establishing the guilt of the defendant beyond a reasonable doubt. Under all the circumstances contained in the record in this case, we conclude that no rational trier of fact could find the defendant guilty beyond a reasonable doubt.

Accordingly, the judgment of the circuit court of Peoria County is hereby reversed and a judgment of acquittal is entered in favor of the defendant.

Reversed.

STOUDER, J. concurs.

JUSTICE GORMAN, dissenting:

I dissent. In this case there was no physical evidence and, therefore, the case turned on the credibility of the various witnesses. Certainly, as in most trials, inconsistencies were revealed through cross-examination. However, it is well settled that it is the function of the trier of fact to weigh the credibility of the witnesses and to resolve conflicts or inconsistencies in the testimony. (*People v. Eyler* (1989), 133 Ill. 2d 173, 191, 549 N.E.2d 268, 276.) The jury did that in this case, and, based on all of the evidence, convicted the defendant.

The jury heard the testimony of the victim, Kelley Gott, Elsie Buhs, Detective Schmidt, and the victim's mother and chose to believe their evidence. I conclude that the evidence withstands the scrutiny of the standard established in *People v. Collins* and that a ra-

tional trier of fact could have found the essential elements of this crime beyond a reasonable doubt.

I likewise conclude that the evidence most damaging to the defendant was properly admitted. The defendant contends that his constitutional rights were violated by the application of section 115—10 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10). Specifically, the defendant contends that section 115—10 violates due process by allowing several witnesses' detailed hearsay statements to be heard by the trier of fact. The defendant also alleges that as section 115—10 is applicable only to defendants accused of committing sex offenses against children under age 13, it creates a class of defendants who are not protected by law equally *vis-a-vis* defendants charged with other types of crimes.

Section 115—10 provides:

"115—10. Sexual acts on child under 13—Hearsay exception

§115—10. (a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

(c) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, the nature of the statement, the circum-

stances under which the statement was made, and any other relevant factor.

(d) The proponent of the statement shall give the adverse party reasonable notice of his intention to offer the statement and the particulars of the statement." Ill. Rev. Stat. 1989, ch. 38, par. 115—10.

The defendant's cited cases of *People v. Morton* (1989), 188 Ill. App. 3d 95, 543 N.E.2d 1366, and *People v. Fisher* (1988), 169 Ill. App. 3d 785, 523 N.E.2d 368, do not support his argument. In *In re R.D.* (1985), 131 Ill. App. 3d 612, 615, 476 N.E.2d 62, 64, the appellate court rejected a due process attack on section 115—10 and cited *People v. Fuelner* (1982), 104 Ill. App. 3d 340, 432 N.E.2d 986, for the following explanation of the basis for the exception:

"The basis for the corroborative statement exception is that it is entirely natural that a rape victim would have spoken out regarding the rape, and the fact that she did not do so would be evidence of the fact that nothing occurred. [Citation.] Consequently, if proof of a complaint was not permitted, the trier of fact might assume that no complaint was made. To forestall this assumption, the prosecution is allowed to show that the alleged victim was not silent but made a complaint. [Citation.]" 104 Ill. App. 3d at 349-50, 432 N.E.2d at 993-94.

The defendant's argument concerning the "cumulative effect" of multiple witnesses has been addressed and rejected. In *People v. Branch* (1987), 158 Ill. App. 3d 338, 511 N.E.2d 872, the court stated:

"The legislature by enacting section 115—10 obviously determined that a corroborative complaint is sufficiently reliable to enjoy an exemption from the rule against hearsay evidence. [Citation.] A second or third complaint is no less reliable or credible. True, there is opportunity for exaggeration or embellishment the longer the time between the incident and each successive complaint. This factor is remedied though through cross-examination (and possible impeachment of the victim from prior inconsistent statements). [Citations.] Once the victim testifies and is subject to cross-examination, the rationale for the rule against hearsay evidence virtually disappears. [Citations.]

Youthful victims often suffer an inability to articulate on the witness stand or lack credibility in general. Their complaints obviously become more credible, reliable and understandable when supported by corroborative complaint testimony from adults. Those who are close to the victim or who have inter-

viewed the victim and investigated the alleged incident should not be curtailed from testifying and aiding the victim merely because of their numbers or order of talking with the victim." 158 Ill. App. 3d at 340-41, 511 N.E.2d at 873-74.

As to the defendant's equal protection attack, it is beyond dispute that the prosecution of sex offense cases where children are victims present special problems of proof that make their prosecution especially difficult. (See, *e.g., People v. Rocha* (1989), 191 Ill. App. 3d 529, 547 N.E.2d 1335.) Since there exists a rational classification for allowing this hearsay exception, the defendant's equal protection argument must fail.

The defendant next makes a two-pronged argument that the trial court erred in allowing the victim to testify. First, the defendant argues that allowing a child of tender years to testify under section 115—14 (Ill. Rev. Stat. 1989, ch. 38, par. 115—14) violated his right to due process. Second, the defendant argues that in this specific case the court erred in finding the five-year-old victim competent and allowing him to testify.

The defendant's first argument contends that the victim may have been told by an adult that these events occurred, that perhaps an adult told him that he should remember the events and that perhaps he went along with the story because he was directed to by an adult. I find this argument to be totally speculative. Certainly, the possibility exists that the victim was told what to say, but that is true of any child victim's testimony. It is the function of the trier of fact to evaluate the testimony based on the witness' demeanor and the inconsistencies in that testimony as highlighted by defense counsel.

The defendant's cited case of *People v. Fisher* (1988), 169 Ill. App. 3d 785, 523 N.E.2d 368, does nothing to support his argument. Contrary to defendant's assertion, the court in *Fisher* did not prevent the testimony of a victim of tender years. The victim in *Fisher* was less than three years old, neither side sought to present her as a witness, and her competency to testify as a witness under section 115—14 was not an issue for the reviewing court.

The defendant's second argument is in regard to the trial court's determination that the victim was competent to testify. Our supreme court has commented that "[i]t is the degree of a child's intelligence, rather than mere chronological age, that determines a child's competence, and '[i]f the witness was sufficiently mature to receive correct impressions by her senses, to recollect and narrate intelligently, and to appreciate the moral duty to tell the truth, she was competent.' [Citations.]" *(People v. Garcia* (1983), 97 Ill. 2d 58, 75, 454 N.E.2d

274, 280.) In *Garcia* the court further commented that there is no rigid formula which is applicable to a determination of competency and "[d]ecisions as to the competency of a witness are reviewable, but in light of the trial court's opportunity to take into account the demeanor of the witness, this court has held that such determinations will be overturned only when it appears that the trial judge has abused his discretion." *Garcia*, 97 Ill. 2d at 75, 454 N.E.2d at 280.

The defendant claims that the trial court abandoned its duty of determining the victim's competence. This is not supported by the record. The record unequivocally demonstrates that the trial court was aware of the standard under section 115—14 and made findings with respect to that standard.

The defendant points to the fact that during *voir dire* of the victim he told the court that he had not told any doctor about the incident. This is contradicted by Dr. Knochel's report and subsequent testimony. Additionally, the defendant points out that the victim had trouble reciting his last name, and the victim's assertion that he could remember every event in his life back to the age of two. Most importantly, the defendant points to the victim's responses to questions about telling the truth as proof that he was not competent to testify:

"Q. [Prosecutor:] Okay. [Name omitted], do you know what the truth is?

A. Yes.

Q. What's the truth? Can you give me an example?

A. Tell the truth.

Q. Okay. Do you know what a lie is?

A. You're not telling a lie.

Q. Not telling a lie?

A. You're telling a lie.

Q. Okay. And can you give me an example of what that is?

A. I don't know. I don't know.

Q. Okay. When she just told you you raised your right hand and you swore to tell the truth. Can you do that?

A. Yeah.

Q. Can you tell me what that means to tell the truth?

(Pause.)

A. (No response.)"

And later, during cross-examination:

"Q. [Defense Attorney:] [Name omitted], now you said you know what the truth is.

A. Yeah.

Q. Okay. And do you know what your last name is?

A. Yes.

Q. What's that?

A. Karmenzind.

Q. Okay. And have you ever told a lie?

A. No.

Q. Okay. Never told a lie?

A. Huh-uh.

Q. Okay. Have you ever just told parts of the truth and not part of the truth?

A. I told a whole truth.

Q. You always tell the whole truth?

A. Yes.

Q. Okay. And you know if you only tell half the truth then could be a lie by just telling half the truth?

A. I don't half the truth, I tell the whole truth.

Q. Okay. And have you ever been spanked for telling a lie?

A. No.

Q. Okay. You ever make up stories or anything like that that are not the truth?

A. No."

In *People v. Lawler* (1989), 181 Ill. App. 3d 464, 536 N.E.2d 1283, a 13-year-old mildly mentally retarded girl was found competent to testify even though she said she did not know the difference between when somebody tells the truth and somebody tells a lie. The court stated: "[T]he witness may well have given ambivalent answers as to knowledge of truth and falsehood. However, the record reflects she did respond she would tell the truth, the truth being to tell what happened, when asked in an understandable manner." *Lawler*, 181 Ill. App. 3d at 469-70, 536 N.E.2d at 1287.

The focus is not on one aspect of the examination but on the examination as a whole. The victim knew that he was five years old, provided the names of the school he attended and his teacher, recited the numbers 1 through 10, and the Pledge of Allegiance and stated that he tells the truth and does not lie. Although he had trouble articulating what is the truth and what is a lie, he did indicate that he understood that it was important to tell the whole truth rather than a "half" truth. I cannot say that the trial court abused its discretion in allowing the victim to testify.

The last issue I address is whether the trial court abused its discretion in denying the defendant's motion for a bill of particulars.

The indictment in the instant case, returned October 3, 1989, charged that the offense occurred between December 1, 1987, and

July 4, 1989. The State need only establish that the offense charged was committed within the statute of limitations and prior to the return of the indictment. (*People v. Barlow* (1989), 188 Ill. App. 3d 393, 544 N.E.2d 947.) This the State did, and thus, it was not an abuse of discretion to refuse the defendant's motion for a bill of particulars.

For the reasons listed above, I would affirm the defendant's conviction and sentence. Accordingly, I dissent.