THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY GILLMAN, Defendant-Appellant.

Second District    No. 79-622

Opinion filed December 9, 1980.

Mary Robinson and Josette Skelnik, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis P. Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

Henry Gillman was charged with the offense of contributing to the sexual delinquency of a minor. After a jury trial, the defendant was found guilty and sentenced to one year probation from which the defendant appeals.

The complaining witness, K.B., was nine years old at the time of the incident in question. She testified on the afternoon of June 17, 1978, she went over to Henry Gillman's house. She arrived there about 1:30 p.m. and stayed until shortly after 5 p.m. The Gillmans and K.B.'s families were neighbors, and K.B. was a friend of the Gillman children, Sue, aged 13, Helen, aged 10, and Caroline, aged 7. On June 17, 1978, K.B. came over to visit the Gillman children. She found that Mr. Gillman and his children were shocking for worms—which means that he was using an electrical rod he had devised which he stuck into the ground when it was soft, causing vibrations which made the worms come out of the ground. The children watched the ground just in front of the device and picked up the worms that came out of the ground.

On the day in question Mr. Gillman was wearing a shirt and cut-off shorts. Mr. Gillman, his daughters and K.B. were shocking for worms at the side of the Gillman garage, which was on the right side and to the back

of the house. During the time that they were shocking K.B. was standing to Mr. Gillman's left and Helen and Caroline were next to K.B. on her left; Sue was to the right of Mr. Gillman.

A wire fence which was shorter in height than K.B. ran along the back of the Gillman garage; directly behind the fence was a neighbor's yard with a house to the left and a garage to the right. As the group shocked for worms they moved forward toward the direction of the fence. K.B. could see into the yard ahead of them from where the group was working but did not notice anyone in that yard. She was not sure whether a man was working in the yard but said that it was possible.

For most of the afternoon Mr. Gillman held the shocker while K.B., Caroline, Helen and Sue looked for worms. At one point Mr. Gillman asked K.B. if she would like to shock and she agreed. She held the handle of the shocker with her right hand and Mr. Gillman put his hand on top of hers. The handle of the shocker was approximately four inches long. When placed in the ground, the shocker would vibrate. K.B. believed that the first time she used the shocker it was in the ground for "at least three minutes."

K.B. testified that a short time after she and Mr. Gillman were shocking the first time, he took her hand off the shocker and pressed it against his pants. She stated that she could feel Mr. Gillman's body under his shorts and that it felt hard. The following exchange took place between K.B. and the prosecutor.

"Q. What part of his pants did he press it against?
A. Down like sort of by the legs, like in between them.
Q. In between his legs?
A. Yes, a little."

During this incident Sue was in front of K.B. and Mr. Gillman with her back towards them probably, looking on the ground for worms. K.B. thought Helen and Caroline were probably standing in front of her, but was not sure. She thought they were also looking in the ground for worms but did not know. When asked whether for the entire three minutes Sue ever turned around to look at K.B. and Mr. Gillman, K.B. replied "No, I know she didn't look up, but I ain't sure."

At about 3:30 or 4 p.m., Helen and Caroline left to go somewhere with their mother. Sue remained in the yard. After Helen and Caroline left, Mr. Gillman asked K.B. if she wanted to shock again and she agreed. When she reached out and held the pole, Mr. Gillman took her hand off the pole and pressed it against his pants again in the same place he had pressed it the first time. K.B. again felt Mr. Gillman's body under his shorts which felt hard.

Although K.B. stated on direct examination that about five minutes elapsed between the first and second incident, she subsequently stated on

cross-examination that the second incident occurred about 15 minutes after Helen had left. When Mr. Gillman pressed K.B.'s hand against his shorts the first time she did not look at his shorts; rather, she testified, "At first, I was looking at the ground because I wasn't exactly sure what had happened or anything." She stated that she was looking at "the ground, Sue, the shocker," but that during the three minutes that Mr. Gillman had her hand on his shorts, she never looked at his shorts. With regard to the second incident, K.B. gave the following testimony on cross-examination:

"Q. But the second time that he had put your hand against his body, you didn't look that time either where he was putting it; did you?

A. No, but he was sort of like feeling his legs a little, not that much, though.

Q. You could feel his legs, one leg or both legs?

A. I ain't sure."

About 10 minutes after the second incident occurred, Mr. Gillman sent Sue into the house to get him a cup of coffee, and only K.B. and Mr. Gillman were left by the garage. Sue was gone about five minutes. The entrance to the Gillman house was visible from where K.B. and Mr. Gillman were standing.

After Mr. Gillman sent Sue inside, K.B. told Mr. Gillman that she had to leave, and Mr. Gillman asked her if she wanted to shock again. K.B. grabbed for the shocker, and Mr. Gillman took her hand and rubbed it up and down on his penis, which she believed was exposed outside his shorts. After he had rubbed her hand up and down perhaps twice, K.B. jerked her hand away.

K.B. believed "probably ten or seven minutes" went by between the time Mr. Gillman asked her a third time to shock and when he placed her hand on his penis. During that period of time, K.B. never actually used the shocker. She stated that, although she did not look at it, what she believed was Mr. Gillman's penis felt long, skinny and oval. It did not feel like the handle of the shocker. During the time this final incident occurred K.B. was looking at "really nothing," and was just "looking up in the air."

Upon being asked whether Mr. Gilman's pants were unzipped at the time this incident occurred, K.B. replied, "I know his pants were down, but I ain't sure if his pants were unzipped, though." She did not see Mr. Gillman unzip his pants, and never saw him with his pants unzipped at all.

After K.B. jerked her hand away, she told Mr. Gillman it was time for her to go home, and started to walk away. Mr. Gillman told her not to tell her parents. As she was leaving, K.B. saw Sue coming out of the house with a cup of coffee. She also saw at the side of the Gillman house Nancy and her friend, who in turn saw K.B. K.B. ran away from the house but

was not crying when she left. She returned home about 10 minutes after 5 p.m.

When K.B. was asked whether she had told anyone what happened, defense counsel objected on the basis that the evidence of a complaint was admissible only in rape cases and not in cases such as the instant one. The court disagreed but stated to defense counsel, "I will let you develop as much as you want on cross-examination as to why."

K.B. subsequently testified that about an hour later she had told her mother what happened and had also talked to the police about it. On cross-examination, defense counsel inquired of K.B. how many times she had talked to her parents, the police and State's Attorney's office about the incident and elicited from K.B. the fact that her parents were present on each occasion when she spoke to the police or the prosecutor's office. On redirect examination, the prosecutor asked her if she had talked with anyone else about the incident and she indicated that she had talked to a Doctor LaRose, who was a lady in Lake Zurich, and K.B. stated as to her, "She helps you, helps you like to get the story straight where it won't always effect [ *sic*] your life." Helen Gillman, the 10-year-old daughter of the defendant was called, and testified that on the afternoon in question she was shocking for worms with her father, her sister, Sue, and K.B. She did not recall whether anyone else was present in the yard at the time. Helen stayed with the group until at least a quarter to five when she left with her mother. She stated that during the time the group was shocking for worms that her father used the shocker most of the time; the rest of the group would look on the ground for worms and put those that they found in a can. While they were shocking, K.B. and Helen were standing to the left of Mr. Gillman and Sue was standing to the right. During the course of the afternoon, Sue asked K.B. whether she wanted to try the shocker and K.B. agreed. Helen watched her father and K.B. during the entire time that K.B. was helping Mr. Gillman use the shocker. She did not see any part of K.B.'s body touch any part of her father's body, other than when K.B.'s hand touched her father's hand on the shocker and she did not see her father place K.B.'s hand against his shorts. K.B. used the shocker only once during the course of the afternoon, according to Helen, who left with her mother about 35 minutes after K.B. tried the shocker.

Sue Gillman, the 13-year-old daughter of the defendant, testified that Caroline and Nancy were also in the area on that day. Sue was helping her father shock for worms from sometime after lunch until 5 p.m. K.B. arrived at the Gillman house at about 1:30 and helped the group shock for worms. K.B. was standing to the left of Mr. Gillman, Helen to the left of K.B., and Sue was standing to the right of her father. At one point during the afternoon, Sue testified, Mr. Gillman helped K.B. use the shocker. She

watched her father and K.B. during the entire time K.B. helped her father with the shocker, and she did not see her father take K.B.'s hand and place it on the front of his pants. K.B. used the shocker only once that afternoon. Sue stated she left her father's side only three times during the afternoon; twice when she went into the house to get him a cup of coffee, and once when she untangled the cord to the shocker which got caught in the side of the garage. At that time Helen was still present in the yard on both occasions when Sue got the coffee for her father. Sue did not see her father touch K.B. or K.B. touch her father, nor did she ever see her father with his pants unzipped during the afternoon. A contractor who was doing aluminum siding work on the next door house testified that he could see Mr. Gillman's entire backyard during the afternoon in question. He could not observe what was happening in the yard while he was doing his aluminum work, but he believed that he observed what was happening approximately 80% of the afternoon. He remained on the job from about noon until 7 p.m. The contractor had talked to Mr. Gillman twice during the day, once at about 4 p.m. and again between 5 and 5:30 p.m. At around 4 p.m. there were a number of children surrounding the defendant, and the contractor did not at any time see Mr. Gillman place his hands on a child's body or have a child place her hand on Mr. Gillman's body, and he did not recall any crying in the Gillman yard.

The defendant testified that he was shocking for worms with his daughters, Helen and Sue, and K.B. Caroline was not helping them but was playing on his property with some other children. K.B. came over to the house about 1:30 p.m. and watched Mr. Gillman and the daughters shock for worms for a while. Later, Sue asked K.B. whether she wanted to try the shocker, and K.B. said yes. Mr. Gillman instructed K.B. to put her hand directly above his on the rod so she would not be in danger of receiving an electric shock. She then placed her hand on the handle of the shocker directly above Mr. Gillman's hand. Both she and Mr. Gillman used their right hands to hold the shocker. The handle of the shocker was about 7½ inches long. During the time that K.B. and Mr. Gillman used the shocker, he testified that Sue was standing to his right and Helen to his left. He and K.B. used the shocker for just a few seconds, long enough to place it in the ground and pull it out again. After K.B. used the shocker, she stayed to watch the others and to look for worms. The defendant testified that at no point during the time they were shocking for worms did he take K.B.'s hand and place it on the front of his pants, nor did he ever unzip his pants or have K.B. place her hand on his penis. He testified that he was never alone with K.B. during the afternoon in question and that he never told anyone he was alone with her.

In this appeal the defendant contends:

(1) that he was not found guilty beyond a reasonable doubt;

(2) that the trial court committed reversible error in allowing into evidence the statement as to the victim's report of the incident and

(3) the trial court erred in permitting evidence as to the psychiatric treatment the victim underwent following the alleged incident.

■■ ■ As to the contention that reversible error was committed by allowing the prosecution to present evidence as to the complaint being made to the parents and the police on the same day of the incident, it is undoubtedly the general rule that in cases of this kind—contributing to the sexual delinquency of a minor—it is error to allow the prosecution to elicit testimony to the effect that a prompt complaint was made of the offense. (*People v. Romano* (1923), 306 Ill. 502; *People v. McKee* (1977), 52 Ill. App. 3d 689; *People v. Buckley* (1976), 43 Ill. App. 3d 53.) In this case the defendant failed to preserve this point because the matter was not set forth in the post-trial motion. Generally, an issue not raised in the appellant's post-trial motion is deemed to be waived. (*People v. Pickett* (1973), 54 Ill. 2d 280.) However, it has been held that since the basis of this rule is that the trial court should have the opportunity to consider and possibly correct any error made at trial (*People v. Irwin* (1965), 32 Ill. 2d 441), in those cases where the trial court was alerted to the contention of error by an objection made by defense counsel during trial, which was overruled, the basis for the rule is to that extent satified, and the objection is not necessarily waived if otherwise meritorious. It was held thus in *People v. Gray* (1977), 47 Ill. App. 3d 1026, where a prior consistent statement was allowed into evidence with the effect of bolstering a witness' trial testimony. And, in *People v. Nunez* (1974), 24 Ill. App. 3d 163, where a motion made at trial to produce certain evidence was denied and the question was not subsequently raised in the post-trial motion but was argued on appeal. In addition, although defense counsel on cross-examination further questioned the witness as to whom she had told and when, such questioning was not intended as a waiver of the claimed error. Rather, the procedure employed by defense counsel was analogous to that used by the defense in *People v. Spates* (1979), 77 Ill. 2d 193.

■■ In *Spates*, the defendant made a motion *in limine* seeking to exclude testimony of a prior conviction for misdemeanor theft. When the motion was denied, defense counsel brought the matter out on direct examination of the defendant, rather than waiting for the State to prove the conviction independently. The supreme court recognized the defendant's decision to raise the issue himself, following denial of his *in limine* motion, was a tactical one designed to lessen the impact of the evidence and ruled that defendant had not waived the issue by bringing out evidence of the conviction. Similarly, in the case at bar, defense counsel's

decision to question the complaining witness, once counsel's objections were overruled, was a matter of strategy by which he sought to limit the impact of the improper evidence. Counsel brought out the fact that the witness had talked with her parents about the alleged incident numerous times over the past year and that the witness' parents were present each time she spoke to the police, thereby suggesting that a 10-year-old may have been coached or that her story may have been colored by prompting from her parents. Such tactics on defense counsel's part did not constitute a waiver of the error involved here.

■ Because evidence of a prompt complaint is inadmissible where the defendant is charged with contributing to the sexual delinquency of a minor, the trial court in the instant case committed reversible error in allowing into evidence K. B.'s complaint to her parents and to the police. The defendant also contends that the court erred in permitting the prosecution to bring out that the victim had undergone psychiatric treatment and the cost thereof. We agree that this contention has merit and constitutes reversible error. We think that the testimony was irrelevant to the issue of the defendant's guilt or innocence of the charge before the jury and tended to prejudice the defendant and confuse the jury. Again, this testimony was not objected to, but the supreme court said, in *People v. Bernette* (1964), 30 Ill. 2d 359, 372 (where prejudicial reference was made to the victim's family, and even though the reference was not objected to):

> "As to the final argument, it is urged that no error occurred because the reference to decedent's family was fleeting, and because no effort was made to correlate defendant's punishment to the ill-effects suffered by the victim's family. We agree with the latter contention, but not the first. The evidence in regard to the decedent's child and step-children was not brought to the notice of the jury incidentally, but was presented by a series of questions in such a way as to permit the jury to understand that it was a matter material and proper to be proved. If any doubt existed, it was removed when the prosecutor went to the extreme of eliciting the ages of the children involved. This entire segment of the evidence, having no relevance to guilt or innocence, could only have had the purpose of prejudicing defendant in the eyes of the jury 'and to arouse in them anger, hate and passion.' "

In the case at hand, it would appear that the questions asked the victim about her visits to a psychiatrist were, as in the *Bernette* case, deliberately intended to elicit the sympathy of the jury and prejudice the defendant in its eyes. The purpose of the visit—to make sure that the incident "won't always effect [*sic*] your life"—was deliberately underlined by the prosecutor and, in our opinion, should not have been allowed

by the court. In such cases the effect of an objection trying to cut off such questions by the defense might be as harmful as allowing it in, and it would appear to us that the court erred by allowing the issue of guilt or innocence of the crime charged be clouded in this way.

For these errors, we reverse the conviction and remand for a new trial.

The defendant has also challenged the sufficiency of the evidence finding him guilty beyond a reasonable doubt, his contention being that the testimony of the minor complaining witness was not clear and convincing and was not corroborated. In view of the mandate of the supreme court in *People v. Taylor* (1979), 76 Ill. 2d 289, that this question be addressed when raised and an appellate court reverses a criminal conviction and remands the case for a new trial, we now consider the issue.

We have considered the evidence presented at the trial and hold that the jury could have properly found the defendant guilty of the offense at bar. In so holding, we protect the defendant's constitutional privilege against double jeopardy and in no way imply a finding as to defendant's guilt which would be binding on the trial court on remand.

Reversed and remanded for a new trial.

LINDBERG and WOODWARD, JJ., concur.