THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES FILES, Defendant-Appellant.

Second District    No. 2—92—0533

Opinion filed April 15, 1994.

Julius Lucius Echeles, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, Robert J. Biderman, Denise M. Ambrose, and Norbert J. Goetten, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE PECCARELLI delivered the opinion of the court:

Following a trial in the circuit court of Lake County, a jury found defendant, James Files, guilty of two counts of attempted murder (Ill. Rev. Stat. 1991, ch. 38, pars. 8—4(a), 9—1(a)(1) (now 720 ILCS 5/8—4(a), 5/9—1(a)(1) (West 1992))), two counts of aggravated discharge of a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 24—1.2(a)(2) (now codified, as amended, at 720 ILCS 5/24—1.2(a)(2) (West 1992))), one count of aggravated battery with a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2(a) (now codified, as amended, at 720 ILCS 5/12—4.2(a) (West 1992))), and one count of armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))). The charges arose from defendant's involvement in a gun battle with two police officers. During the gun battle, one of the police officers, Detective David Ostertag (Ostertag), was shot and seriously wounded. The trial court sentenced defendant to 30 years' imprisonment for the attempted murder of Ostertag and 20 years' imprisonment, to be served consecutively, for the attempted murder of Ostertag's partner, Detective Gary Bitler (Bitler). The trial court did not impose sentences on defendant's other convictions.

On appeal, defendant contends that: (1) the trial court erred when it admitted evidence that a warrant was outstanding against him; (2) the trial court erred when it excluded evidence which was intended to rebut the State's motive evidence; and (3) this court should vacate his unsentenced convictions.

The relevant facts, gleaned from the testimony at trial, are as follows. At about 11:30 p.m. on May 1, 1991, two uniformed Round Lake Beach (RLB) police officers on routine patrol observed a van registered to defendant parked outside a self-storage unit. Upon investigation, the officers discovered defendant and another man, David Morley (Morley), in possession of a stolen Chevy Blazer inside the self-storage unit. Defendant told the RLB officers he did not have identification. When one of the officers patted defendant down and felt a wallet, defendant fled. The police were unable to apprehend defendant. The police arrested Morley and charged him with possession of a stolen vehicle.

On May 2, 1991, Patrick M. Mahoney (Mahoney), one of the officers who arrested Morley, accompanied Morley to court for a bond hearing on the possession of a stolen vehicle charge. During the hearing, in Morley's presence, Mahoney told the judge that the police intended to obtain a warrant for defendant. Morley was released on bond. A warrant was subsequently issued for defendant's arrest for possession of a stolen vehicle.

On May 7, 1991, at approximately 3:45 p.m., RLB Detectives Bitler and Ostertag were riding in an unmarked squad car north-

bound on Rand Road. Ostertag was driving. As they drove by a gas station, Bitler saw defendant pumping gas into a grey Pontiac; Bitler told Ostertag. Bitler and Ostertag knew that defendant was wanted for possession of a stolen vehicle because on May 2, 1991, Officer Mahoney had shown them a picture of defendant and explained that defendant had fled the previous day. Bitler testified that on May 2, 1991, Mahoney had also told Bitler that Mahoney intended to get a warrant for defendant's arrest.

Ostertag turned the squad car around and drove back toward the gas station. As the squad car turned into the gas station driveway, defendant was at the pay booth and Ostertag saw and recognized Morley, who was sitting in the driver's seat of the Pontiac, which was facing the squad car. Ostertag had seen and spoken to Morley at the RLB police station on May 2, 1991, while Morley was in custody. Morley looked in the direction of the squad car and made eye contact with Ostertag. Morley then made a quick U-turn so the Pontiac was headed away from the squad car and drove to the pay booth. Defendant, who was walking away from the pay booth, looked in the direction of the squad car, "his eyes got big," he changed direction, and ran towards the Pontiac. Defendant jumped into the Pontiac, which sped out of the gas station with Morley driving and defendant in the front passenger seat. The Pontiac failed to stop for a stop sign as it entered Rand Road heading north.

Ostertag drove the squad car in pursuit of the Pontiac. As the squad car exited the gas station, the officers activated a red flashing light which Ostertag placed on the dashboard, wig-wag lights (white flashing lights in the car's grill), and a siren. Bitler made a radio call for assistance on a statewide radio channel. The police pursued the Pontiac, which was heading north on Rand Road at a high rate of speed. The police car stayed a few car lengths behind the Pontiac.

During the pursuit, Ostertag saw defendant reach from the front passenger seat into the rear seat area of the Pontiac. He saw defendant pull a "package" of some sort and a chrome-colored pistol into the front seat area.

As the cars approached an intersection, a marked Kildeer police department squad car heading south on Rand Road turned left into the intersection in the path of the speeding Pontiac. Jay Mills (Mills), the Kildeer police chief, was driving the Kildeer squad car which had side markings, a red flashing light permanently mounted on the dashboard, rear strobe lights, and a siren. Mills was in police uniform. Mills saw the Pontiac and the unmarked squad car pass through the intersection and realized they were the vehicles involved in a police pursuit he had heard described in a radio message. Mills saw the

flashing lights in the unmarked squad car and heard its siren. Mills turned his squad car around, activated its emergency lights and siren, and pursued the other two cars.

After the Pontiac had gone 200 to 300 yards past the intersection, it made an abrupt right turn off of Rand Road into a driveway, hit a tree, and came to a halt. Ostertag, who had stopped the unmarked squad car in Rand Road, saw defendant hold up a chrome semiautomatic pistol and begin to exit the Pontiac by way of the front passenger door. Ostertag yelled to Bitler that defendant had a gun and drove the squad car into the Pontiac's passenger door in order to prevent defendant from exiting the Pontiac with the gun. Defendant then began to slide across the front seat of the Pontiac. Ostertag did not know where Morley was at that time.

Ostertag exited the squad car in a crouch. He had not yet drawn his gun. When Ostertag looked up, he saw Morley with his arms extended over the Pontiac pointing a blue steel semiautomatic pistol at Ostertag. Morley fired one shot which hit Ostertag in the chest.

After he was shot, Ostertag backed up towards the rear of the squad car. He could see Morley and defendant, who both had guns pointed at him and who both were firing at him. As Ostertag got near the rear bumper of the squad car, Bitler fired a shot in the direction of Morley and defendant. Morley and defendant then both pointed their weapons at Bitler and began firing at Bitler. After both officers returned fire, Morley and defendant fled from the scene on foot. All of the shooting occurred within a period of about 25 seconds. Ostertag then collapsed to the ground and was subsequently taken to a hospital where he received treatment, including surgery, for his gunshot wound. Numerous law enforcement personnel arrived at the scene a short time after the shooting.

Law enforcement officers, aided by dogs, conducted a search for the shooters. Morley was soon found hiding in a culvert 200 to 300 yards from the scene of the shooting. About three hours later, officers found defendant virtually submerged in knee-deep water in a swamp. Later, searchers found a gun case containing an AKS 7.62 semiautomatic rifle and 29 rounds of ammunition about five feet from where defendant was found. Nearby, searchers also found a semiautomatic pistol with an empty magazine in its clip and an empty bullet chamber. Nine bullets were also found nearby. A search of the Pontiac driven by Morley revealed a canister containing 520 rounds of ammunition suitable for the automatic rifle.

On appeal, defendant first contends that the trial court erred when it admitted evidence that the warrant for possession of a stolen vehicle was outstanding against defendant. Defendant cites testimony

by Ostertag and Bitler and a prosecutor's statement during closing argument. Defendant points to the following testimony by Bitler:

"Q. Directing your attention specifically to about 3:30 that afternoon, do you recall where you and Officer Ostertag were at that time?

A. Yes, we were traveling back to our police department in our car. Sergeant Ostertag was driving. I was a passenger. We were traveling northbound on Route 12 heading back; and at Plum Grove Road there was a Checker Gas Station there, and I observed the subject that Mr. Mahoney had said had escaped from him and that Mr.—or Officer Mahoney had gotten a warrant for possession of stolen auto standing at that gas station putting gas into a car."

Defendant also maintains that Ostertag testified that a warrant had been issued for defendant's arrest and cites a specific page of the appeal record. The relevant testimony by Ostertag at that location in the appeal record is as follows:

"A. As we were passing a Checker Gas Station located at the northeast corner of Rand Road and Plum Grove Road, Detective Bitler said that he saw a subject known to us as James Files in the gas station.

Q. Did you know who he was talking about?

A. Yes, I did.

\* \* \*

Q. How did you know who he was talking about?

A. Well, on May 2d of 1991, when we came to work, we were advised that Officer Mahoney and Officer Griesz, other officers of our department, had discovered two subjects inside a storage facility in Round Lake Beach dismantling a stolen car. One of those subjects, a James Files, had fled from Officer Mahoney the night before. He showed us a Round Lake Beach mug photo of James Files to show us the subject that he was talking about, the person that had fled."

Ostertag then identified defendant from the photographs that Mahoney had shown Ostertag on May 2, 1991.

The statement by the prosecutor during closing argument was:

"What does [defendant] do when he knows police officers are chasing him? Does he say to David Morley, 'Hey, pull over. Pull over.' Did you see him doing that in the car? Nobody saw him doing that.

What you see him doing is reaching into the back seat [sic] of the car to get a bag and a gun. Why? If you know police officers are chasing you, why do you reach for a gun? Because you don't want to get caught. That is why. You don't want to get caught when there is a warrant out for you. You don't want to get caught

with an AK 47 in your car with 520 rounds of AK 47 ammunition in your car."

Defendant contends that the admission of the evidence regarding the warrant improperly allowed the State to create a motive for defendant to shoot at policemen. Defendant argues that the admission of this evidence was erroneous because when the State seeks to prove a fact to show a motive it must show that the accused knew of the fact. Defendant maintains that there was no solid evidence that defendant knew of the warrant in this case.

The State initially responds that defendant has waived this issue. First, the State notes that defendant filed a motion *in limine* seeking to exclude evidence of the warrant and that the trial court denied the motion *in limine*. The State argues that denial of a motion *in limine* does not preserve an objection to disputed evidence later presented at trial. We disagree.

■ Although a number of appellate court cases have held that in order to preserve an objection to disputed evidence a party must contemporaneously object when the evidence is offered even if the party's motion *in limine* on the matter has been denied (see, *e.g.*, *Cunningham v. Millers General Insurance Co.* (1992), 227 Ill. App. 3d 201, 206), our supreme court recently held that a defendant preserves an issue for appeal by either raising the issue in a motion *in limine* or objecting at trial and also raising the issue in a post-trial motion. (*People v. Hudson* (1993), 157 Ill. 2d 401, 434-35.) Here, defendant preserved the issue when he raised it both in his motion *in limine* and in his post-trial motion. We therefore conclude that defendant did not waive the issue by failing to make a contemporaneous objection.

The State also argues that defendant waived the issue of admissibility of evidence of the warrant when defendant cross-examined witnesses regarding the warrant. The State cites *People v. Schmitt* (1990), 204 Ill. App. 3d 820, as authority for its position. In *Schmitt*, the appellate court concluded that defendant there waived the issue of admission of other crimes evidence because defendant (1) did not object to the admission of the evidence, (2) subsequently cross-examined on the matter, and (3) did not raise the issue in his post-trial motion. (204 Ill. App. 3d at 828.) The *Schmitt* court did not elaborate, but cited a number of cases, including *People v. Bost* (1980), 80 Ill. App. 3d 933, as authority for the point that defendant waived by cross-examining. 204 Ill. App. 3d at 828.

Defendant responds that later cases have called the *Bost-Schmitt* rule into question. In *People v. Deal* (1989), 185 Ill. App. 3d 332, the Appellate Court, Fifth District, which authored *Bost*, held that

"where the defense is responding to the State's having elicited damaging evidence over defense objections, further inquiry [in the form of cross-examination] is not waiver." (185 Ill. App. 3d at 339.) The *Deal* court relied on a second district case, *People v. Gillman* (1980), 91 Ill. App. 3d 53. *Deal*, 185 Ill. App. 3d at 339.

In *People v. Agyei* (1992), 232 Ill. App. 3d 546, the court, relying on *Deal*, concluded that the continuing vitality of *Bost* was suspect. (232 Ill. App. 3d at 552.) The *Agyei* court also concluded that *Bost* did not directly apply because the cross-examination there was not directed at the disputed evidence (an oral confession) itself, but rather whether a witness had improperly failed to disclose the evidence during discovery. 232 Ill. App. 3d at 552.

With these principles in mind, we conclude that defendant did not waive the admissibility of evidence of the warrant issue when he cross-examined Bitler and Ostertag. The cross-examination did not specifically address the warrant itself. With respect to the cross-examination of Ostertag, the testimony pointed to by the State to support its waiver argument is as follows:

"Q. If I can just back up a minute, Officer. Did you speak to Officer Mahoney or Officer Griesz at all about this—about the event they had earlier with Mr. Morley and Mr. Files?

A. On May 1st?

Q. Yes.

A. Yes, I did.

Q. Had they told you anything about Mr. Morley or Mr. Files having any weapons?

A. No, they did not."

The cross-examination testimony of Bitler pointed to by the State is as follows:

"Q. Now, when Officer Mahoney showed you that photograph on May 7th, [*sic*] did you recognize the person in the photograph as someone you had contact with before?

A. No, I had not had contacts with him prior.

Q. You had never seen James Files until you saw that photograph?

A. Correct.

Q. As far as you know, he never saw you until May 7th?

A. As far as I know."

As in *Agyei*, *Bost* does not directly apply in this case. Defense counsel did not ask either Ostertag or Bitler about the warrant itself. Although each cross-examination addressed Officer Mahoney's informing Ostertag and Bitler about a prior offense involving defendant, it does not necessarily follow that a warrant is connoted. Under these facts, we will not extend the *Bost-Schmitt* rule to find waiver in this case.

We now turn to the merits of the warrant admissibility issue. Defendant correctly asserts that the mere existence of a warrant does not establish a motive to avoid apprehension. (*People v. Wilson* (1987), 116 Ill. 2d 29, 52.) In order for the existence of a warrant to be admissible to show a defendant's motive, the State must establish that the defendant knew about the warrant or knew that officers were attempting to arrest defendant. *Wilson*, 116 Ill. 2d 29.

■ Here, the evidence of the warrant was admissible in light of the facts established at trial. During a bond hearing for Morley on May 2, 1991, in Morley's presence, Officer Mahoney stated to the bond hearing judge that Mahoney intended to obtain a warrant for defendant for possession of a stolen vehicle. A person in Morley's position who learns that the police intend to obtain a warrant for his partner in a criminal endeavor will very likely, given a chance, inform his partner of the warrant. In view of the evidence that Mahoney made his statement regarding a warrant in Morley's presence, and in view of the fact that Morley had subsequent contact with defendant, we conclude that there was sufficient circumstantial evidence to establish that defendant knew of the warrant.

In addition, the intensity of defendant's attempt to escape police apprehension tends to show defendant knew he was fleeing from a serious offense for which he could be arrested. (See *People v. Salazar* (1988), 126 Ill. 2d 424, 456.) It is unlikely that defendant would participate in a gun battle with police for anything less than a serious offense such as possession of a stolen vehicle.

Finally, we note that the existence of the warrant was not the only theory proposed by the State as a motive for defendant. As the prosecution stated in its closing argument, defendant may well have decided to shoot it out with the police because he did not want to get caught with an AK 47 assault weapon and more than 500 rounds of ammunition in his car. Thus, even if *arguendo* the warrant evidence was inadmissible, any error would have been harmless because there was another motive theory which more than explained why defendant decided to shoot at policemen.

For these reasons, we find that the trial court did not err when it admitted the evidence of the warrant against defendant for possession of a stolen vehicle.

Defendant next contends that the trial court erred when it excluded evidence which was intended to rebut the State's motive evidence. The trial court excluded the evidence when it sustained the State's relevancy objection to the testimony of Kathleen Marbry (Marbry). On appeal, defendant maintains that Marbry would have testified that around May 1, 1991, defendant had rented an apartment

in the area from her, resided in the apartment, and intended to continue residing in the apartment as of the time of his arrest on May 7, 1991. Defendant argues that this testimony was relevant because it tended to refute the State's motive evidence that defendant was fleeing the area.

The State initially responds that defendant failed to preserve this issue for review because he did not make an adequate offer of proof on the matter. We agree.

Our supreme court recently set out the basic principles regarding the necessity for an adequate offer of proof relating to excluded evidence. The court stated:

"It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. [Citations.] The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper. [Citation.] The failure to make an adequate offer of proof results in a waiver of the issue on appeal. [Citations.]

Where an objection is sustained to the offered testimony of a witness, an adequate offer of proof is made if counsel makes known to the trial court, with particularity, the substance of the witness' anticipated answer. [Citation.] An offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate. [Citation.] Neither will the unsupported speculation of counsel as to what the witness would say suffice. [Citation.] Rather, in making the offer of proof, counsel must explicitly state what the excluded testimony would reveal and may not merely allude to what might be divulged by the testimony. [Citation.] The offer serves no purpose if it does not demonstrate, both to the trial court and to reviewing courts, the admissibility of the testimony which was foreclosed by the sustained objection." *People v. Andrews* (1992), 146 Ill. 2d 413, 420-21.

■ Based on these principles, we conclude that defendant failed to make an adequate offer of proof as to the substance of Marbry's testimony. Defendant's counsel did not make a formal offer of proof. After the State objected to Marbry's testimony, outside the hearing of the jury, the following arguments were made between Mr. Quilty, a prosecutor, and Mr. Winer, defendant's counsel:

"MR. QUILTY: I would like to know what the relevance of this is.

MR. WINER: Relevance is I think it is contrary to one of the State's arguments Mr. Files was running from the possession of a stolen motor vehicle warrant. I think this witness will testify—

MR. QUILTY: You think.

MR. WINER: Well, I am assuming she would—talked to her—that he rented a house from her; and around May 1st this incident happened. He was still in that apartment. To her knowledge, he didn't make any attempt to move."

Later, during the same discussion, another defense attorney stated:

"The point Mr. Winer was trying to make is this witness would basically testify to things which suggest that Mr. Files was staying in the area. We expect the State because they said it several times, their theory here is that Mr. Files was attempting to escape from the area. There is evidence that would suggest he was staying in the area, that he was remaining, he was establishing residence. That would contradict the State's argument."

Neither of these statements constituted an adequate offer of proof. Rather, both were conclusory and merely summarized in a speculative way what Marbry's testimony might be. Where, as here, the witness was available to testify, an offer of proof should not have been made by an attorney's recitation of the possible testimony of the witness. (*People v. Petitt* (1993), 245 Ill. App. 3d 132, 144.) Under these circumstances, the unsupported testimony of counsel as to what Marbry might say was not adequate as an offer of proof. Defendant's failure to make an adequate offer of proof results in waiver of this issue on appeal.

Defendant last contends that we must vacate his unsentenced convictions. Defendant was convicted of and sentenced for two counts of attempted murder. Defendant was also convicted of one count of aggravated battery with a firearm, one count of armed violence, and two counts of aggravated discharge of a firearm. Defendant was not sentenced on those convictions.

Defendant contends that because each indictment was based on the same two physical acts it was improper to convict him of more than one offense for each act, *i.e.*, attempted murder for each act of shooting. Defendant relies on *People v. King* (1977), 66 Ill. 2d 551, for the proposition that a defendant may not be convicted of more than one offense arising out of the same physical act. Defendant also asserts that we must vacate his unsentenced convictions because they were lesser included offenses of attempted murder.

The State concedes that the judgments of conviction entered against defendant for armed violence and aggravated battery with a firearm should be vacated, presumably because they are lesser included offenses of attempted murder. However, the State contends that we should remand to the circuit court for the imposition of sen-

tences on the aggravated discharge of a firearm conviction. The State argues that we should do this because *King* allows multiple convictions and concurrent sentences in cases, such as this case, where a defendant has committed several acts, even if they are closely related acts, each act supports a different offense and none of the offenses is a lesser included offense of the sentenced offenses.

Specifically, the State maintains that the shots fired by Morley support both of the attempted murder convictions against defendant. The State argues that the separate acts of defendant shooting at each of the police officers can then support the aggravated discharge of firearm offenses.

The *King* court summarized its holding as follows:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566.

Under these principles, if the shooting of Ostertag and the shooting at Bitler each constituted a single act, then each act will support a conviction and sentencing for only one offense, attempted murder. Moreover, if the shooting at each officer involved multiple acts and lesser included offenses, then only the attempted murder sentences are warranted. (See *People v. Yeast* (1992), 236 Ill. App. 3d 84, 88-89.) However, if the shootings involved multiple acts and the charges were not lesser included offenses, then concurrent sentences are warranted for the unsentenced convictions. *King*, 66 Ill. 2d at 566.

■ We conclude that there were multiple acts of shooting at each officer in this case. First, Morley acted when he shot Ostertag. Morley also acted when he shot at Bitler. These acts support attempted murder convictions against defendant, who was Morley's accomplice. Defendant also acted twice, once when he shot at Ostertag and again when he shot at Bitler. Defendant's two acts support two convictions of aggravated discharge of a firearm. Thus, during the gun battle, there were four separate acts which support four convictions.

Under the *King* principles, we must next determine whether

aggravated discharge of a firearm is a lesser included offense of attempted murder. The Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 1—1 *et seq.*) defines a lesser included offense as one which "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." (Ill. Rev. Stat. 1991, ch. 38, par. 2—9(a) (now 720 ILCS 5/2—9(a) (West 1992)).) Stated more simply, a lesser included offense is one composed of some, but not all, of the elements of the greater offense, and which does not have any element not included in the greater offense. *People v. Jones* (1992), 149 Ill. 2d 288, 292-93.

Despite these definitions, the grounds for determining whether a particular offense is a lesser included offense of another are not always clear. (*People v. Krueger* (1988), 176 Ill. App. 3d 625, 630.) Sometimes, courts have looked to the abstract definitions of crimes and compared the elements of the crimes, and at other times courts have looked to the language used in the charging instruments or the evidence presented at trial. *Krueger*, 176 Ill. App. 3d at 628.

Our analysis of the abstract elements of the crimes leads to the conclusion that aggravated discharge of a firearm is not a lesser included offense of attempted murder. This is because the actual discharge of a firearm is a necessary element of the crime of aggravated discharge of a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 24—1.2(a)(2) (now codified, as amended, at 720 ILCS 5/24—1.2 (a)(2) (West 1992))), but is not a necessary element of attempted murder even when a firearm is involved, given the impossibility doctrine (Ill. Rev. Stat. 1991, ch. 38, par. 8—4(b) (now 720 ILCS 5/8—4(b) (West 1992))). Under the impossibility doctrine, a person could commit an attempted murder by taking a substantial step toward the commission of a murder if the person pointed a firearm at an intended victim, pulled the trigger, and the firearm did not discharge for some reason, such as a malfunction. Ill. Rev. Stat. 1991, ch. 38, par. 8—4 (now 720 ILCS 5/8—4 (West 1992)).

Nor does our analysis of the language of the charging instrument or the facts established at trial change our conclusion. The indictment returned against defendant and Morley charged that they committed two counts of attempted murder when they shot Ostertag and shot at Bitler. The indictment also charged that defendant and Morley committed two counts of aggravated discharge with a firearm when they knowingly discharged a firearm in the direction of the two police officers. The trial evidence established that both defendant and Morley shot at both police officers. The record indicates that the acts of shooting at the policemen by either defendant or Morley would

have been sufficient to support the attempted murder charges. See *People v. Turcios* (1992), 228 Ill. App. 3d 583 (specific intent element of attempted murder may be inferred from the act of shooting at intended victim).

Nonetheless, as seen above, the acts of defendant and Morley were separate acts. Where, as here, it is determined that multiple acts occurred and, based on a comparison of the elements of the crimes, lesser included offenses were not involved, under *King*, multiple convictions and concurrent sentences are proper. Accordingly, the aggravated discharge of a firearm convictions should stand, and the circuit court should impose concurrent sentences on those convictions. See *People v. Dixon* (1982), 91 Ill. 2d 346, 355-56 (proper to remand for sentencing on unsentenced convictions satisfying *King*).

Based on the foregoing, the judgment of the circuit court of Lake County is affirmed as to the convictions of attempted murder and aggravated discharge of a firearm. The cause is remanded to the circuit court with directions to vacate the convictions of aggravated battery with a firearm and armed violence and to impose sentences on the aggravated discharge of a firearm convictions to run concurrently with the attempted murder sentences.

Affirmed in part; remanded with directions.

WOODWARD and QUETSCH, JJ., concur.