No. 2--02--0400    

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF  
 )  Appeal from the Circuit Court

ILLINOIS,   )  of Boone County.

   )  

Plaintiff-Appellee,   )

   )  

   )  No. 00--CF--133  

   )   

ROBERT J. HODOR,   )  Honorable

   ) Gerald F. Grubb,

Defendant-Appellant.   ) Judge, Presiding.

JUSTICE GROMETER delivered the opinion of the court:

Following a jury trial in the circuit court of Boone County, defendant Robert J. Hodor was convicted of one count of criminal sexual assault (720 ILCS 5/12--13(a)(3) (West 2000)).  The trial court sentenced defendant to four years' imprisonment.  On appeal, defendant argues that the trial court committed several evidentiary errors that deprived him of a fair trial.  Defendant also complains that defense counsel's failure to object to these alleged errors resulted in ineffective assistance of counsel.  We reverse and remand the cause for a new trial.

I. BACKGROUND

On or about August 8, 2000, defendant was charged by criminal complaint with one count of criminal sexual assault (720 ILCS 5/12--13(a)(3) (West 2000)).  The State later charged defendant by information.  As amended, the information alleged that, on or about the last week of January or the first week of February 2000, defendant placed his tongue in the sex organ of his stepdaughter, Marilyn S.  Prior to trial, defendant filed a motion 
in limine
 seeking to bar the State from presenting testimony from "counselors."  The motion stated "[a]ny testimony from counselors would be hearsay and cumulative as to what the minor may testify to."  At the hearing on his motion, defendant argued that any statements Marilyn made to the counselors during psychological examinations were inadmissible.  The State agreed that Marilyn's remarks to her counselors during these sessions would be inadmissible, and the trial court granted defendant's motion.

The State's first witness was Marilyn S.  Marilyn testified that during the last week of January and the first week of February 2000, she was 17 years old and a senior at Belvidere High School.  At that time, she resided on Poacher Circle in Belvidere with her mother, her stepfather (defendant), her stepbrother, her stepsister, and Melissa S., her sister.

Marilyn recounted the events of the day of the alleged offense.  Marilyn stated that she left the family residence at about 7 a.m. to go to school.  After school, she attended track practice before returning home between 5:30 and 6 p.m.  When she arrived home, only her sister, her stepbrother, her stepsister, and defendant were present.  Marilyn had a snack, played with the dogs, and spoke with her sister and stepsister.  She then went to her room to do homework.  At about 8 p.m., Marilyn dined with her siblings.  After dinner, Marilyn went upstairs, where she bathed, prepared her clothes for the following day, set her alarm clock, and dried her hair.  At about 10 p.m., Marilyn dressed in a nightgown and went downstairs to say goodnight.

Marilyn encountered defendant in the kitchen where he was mixing something in a blender.  Defendant told Marilyn he was preparing a White Russian.  At defendant's request, Marilyn took a sip of the drink.  Marilyn then escorted the dogs to the basement where they slept.  As Marilyn was heading to bed, defendant called her into his bedroom.  Marilyn entered the room.  A radio was tuned to a popular station, and there were lit candles on the bed's headboard.  Defendant had prepared two drinks.  On three or four occasions, defendant suggested that Marilyn have a drink "to loosen up."  Eventually, Marilyn began drinking.  Marilyn identified the drink as a White Russian and testified that she became light-headed and queasy as she drank the beverage.

Initially, defendant and Marilyn talked about school, track, and her boyfriend.  Defendant told Marilyn that he would talk to her mother about extending her curfew.  Approximately 45 minutes into the conversation, defendant asked Marilyn how well she gave back rubs.  Marilyn responded "okay, I guess."  Defendant then took his shirt off and lay face down on the bed.  Marilyn began massaging his back and shoulders.  At some point, defendant told Marilyn to take off her clothes.  She initially refused.  However, defendant insisted, and Marilyn eventually complied.  Shortly later, defendant told Marilyn that he was going to show her how to give a good back rub.  Marilyn lay face down on the bed, and defendant began to massage her back.  At defendant's request, Marilyn changed to a supine position.  Defendant then rubbed lotion on Marilyn's shoulders, breasts, stomach, legs, and around her vagina.  At one point, defendant placed his tongue in Marilyn's vagina and licked it inside and out.  Marilyn told defendant to stop, and he did.  Defendant then pulled down his shorts and placed Marilyn's hand on his penis.  Marilyn asked defendant to leave her alone, and he told her she could go to bed.  Marilyn dressed and ran to the bathroom, where she vomited.  While Marilyn was in the bathroom, defendant entered with her underwear, which she had left in his bedroom.  Marilyn then changed her pajamas and went to bed.

Approximately four months later, Marilyn and her sister, Melissa S., were discussing the fact that their mother was going to divorce defendant.  At that time, Marilyn related part of what transpired between her and defendant months earlier.  Later that same day, Marilyn's mother came to the store where Marilyn worked and had her recount the incident for the police.

Marilyn testified that the incident affected her school performance.  Prior to the incident, she had perfect attendance at school.  However, during the spring 2000 semester, she missed 12½ days of school.  Marilyn also said that she had trouble concentrating at school.  She stated that her grades were "usually honor roll," but that she had "a couple of C's [
sic
] and D's [
sic
]" during the spring 2000 semester.  Marilyn testified that she began counseling in response to the incident between her and defendant.

Marilyn's mother, Barbara O., testified that she met defendant in 1991, when Marilyn was nine years old.  Five months later, defendant began living with Barbara and her children.  On February 14, 1998, Barbara and defendant got married.  That same year the family moved to the Poacher Circle address.

During January and February 2000, Barbara was employed as a nurse at a health care center that was located about an hour's drive from her home.  Normally, Barbara worked the 7 a.m. to 3 p.m. shift.  However, due to surgery, Barbara was not working during most of January.  She resumed working at the end of January.  Late in January and early in February, Barbara worked the 3 to 11 p.m. shift because those were the only hours available.

Barbara testified that before she and defendant began experiencing marital problems, defendant initiated sexual relations with her on a few occasions.  Normally, defendant would light candles in the bedroom and play music.  Barbara testified that after her surgery, she and defendant had no sexual contact.  On February 14, 2000, defendant informed Barbara that he was leaving her.  Defendant moved out of the Poacher Circle home sometime in the middle of February.  During the two-week period prior to moving out, defendant spent very little time in the house.  Barbara described Marilyn's demeanor during the same two-week period as quiet.  Normally, Marilyn was "[b]ubbly, happy, talking."  Barbara recalled that on one occasion, she asked Marilyn to dust her bedroom furniture.  When Marilyn finished the task, she was crying.

Barbara testified that on May 31, 2000, her daughter Melissa told her about what happened between Marilyn and defendant.  As a result of this conversation, Barbara picked up Marilyn from work, took her home, and called the police.  In June 2000, Barbara filed for a divorce.

Melissa S. was 17 years old at the time of her testimony.  She testified that late in January or early in February 2000, she resided with Marilyn, her mom, defendant, and defendant's children in Belvidere.  Melissa recalled one evening late in January or early in February 2000, when she observed defendant mixing a liquid in a blender.  Melissa asked defendant what he was making.  He replied that "it's not for little kids."  Defendant then told Melissa and his two children to go to bed and to close their doors.  Melissa found the latter request unusual because her mother normally required the children to keep their bedroom doors open.

In May 2000, Melissa had a conversation with Marilyn.  Melissa told Marilyn that their mother and defendant were getting divorced.  Marilyn, who was crying, then told Melissa that something happened between her and defendant.  Melissa later reported the conversation to Barbara.  Thereafter, Melissa and Barbara picked up Marilyn at her place of employment, took Marilyn home, and contacted the police.

Cheryl Gieseke, an assistant principal at Belvidere High School, testified that Marilyn attended the school for four semesters, graduating in spring 2000.  Gieseke testified that during Marilyn's first three semesters at Belvidere High School, she had only one absence.  However, Marilyn accumulated a total of 12½ absences during just the spring 2000 semester.  Gieseke testified that during the fall 1999 semester of school, Marilyn received one A, four Bs, and two Cs, for a grade point average (GPA) of 3.5.  During the spring 2000 semester, Marilyn received three As, one B, and two Cs, for a GPA of 3.0.  All but one of the classes Marilyn took during the spring 2000 semester were electives.

Paula DiCaprio testified that she has a master's degree in counseling and works as a therapist for Rockford Sexual Assault Counseling.  DiCaprio initially counseled Marilyn between June 2000 and March 2001.  When asked why Marilyn began counseling with her, DiCaprio responded that "[Marilyn] had reported that she had been sexually abused."  Defense counsel objected to this remark.  The trial court overruled the objection, but prohibited the State from inquiring about the details.  When DiCaprio's testimony resumed, she stated that Marilyn "presented with some very serious trauma reaction symptoms primarily."  After suspending their sessions in March 2001, Marilyn resumed seeing DiCaprio in September 2001.

J.P. Grace, the assistant counseling supervisor for Catholic Charities, testified that she holds a master's degree in general counseling.  Grace counseled Marilyn from March 29, 2001, through September 6, 2001, for a total of 17 sessions.  Over defendant's objection, Grace testified that her treatment goal for Marilyn was "to minimize the effects of sexual trauma."  Grace characterized Marilyn as very cooperative and motivated during their sessions together.

Thea Bruce testified that she is the executive director at Family Advocate, a social service agency, and has both administrative and clinical duties.  On the clinical side, Bruce is a licensed clinical professional counselor who is responsible for the training and clinical supervision of the professional staff at the agency.  Bruce testified that Family Advocate specializes primarily in child sexual abuse.  Bruce testified regarding "child sex abuse accommodation syndrome."  This "syndrome" is actually a pattern of five behavioral characteristics often observed in children who have been sexually abused.  The characteristics are secrecy, helplessness, entrapment or accommodation, delayed or unconvincing disclosure, and recantation.  Bruce admitted that not all victims of child sexual abuse will exhibit all these characteristics.  She also stated that the fact that a child exhibits some of these characteristics does not necessarily mean that the child has been sexually abused.

Bruce testified that the concept of delayed or unconvincing disclosure recognizes that children do not necessarily report that they have been abused right after it happens.  Moreover, when they do make such reports, they are often viewed as incredible.  Bruce testified that this characteristic is often observed when the relationship between the victim and the perpetrator is that of parent-child or caretaker-child.  In such situations, the child initially opts not to disclose the incident for fear of the consequences of reporting it, 
e.g.
, hurting the other parent, sending the perpetrator to jail, or being viewed as incredible.  However, once the child feels distant from the offender, the minor may disclose the matter.  Bruce offered that, in her experience, delayed disclosure is common and that "most" of the children she has seen did not make an immediate disclosure. 

Following Bruce's testimony, the State rested.  Defendant then moved for a directed verdict, which the trial court denied.  Defendant's first witness was his son, Robert H. II.  Robert testified that he is 17 years old and that he met defendant's ex-wife, Barbara, when he was seven years old.  Robert described his relationship with Barbara as "not very good."  According to Robert, Barbara physically and verbally abused him if he did not perform his chores properly.  Robert testified that he also observed Barbara strike Melissa, Marilyn, and his sister for the same reason.  Robert never called the police to report these allegations.  Robert also stated that Barbara imposed a rule requiring the children to keep their bedroom doors open at night. 

Defendant testified that he first met Barbara in 1991.  That same year they began cohabiting.  The couple married in 1998.  Defendant moved out of the marital home late in February 2000.  He later filed for divorce.  Defendant denied touching Marilyn in an inappropriate manner.  In addition, he denied touching Marilyn's body or vagina with his tongue or having Marilyn touch his penis.

Defendant admitted that he spoke with Cristina Gloria of the Department of Children and Family Services (DCFS).  Defendant testified that he was unaware that the purpose of Gloria's visit was to investigate an allegation that he molested Marilyn.  Defendant believed that Gloria was looking into allegations of child abuse by Barbara.  Defendant did acknowledge that immediately prior to speaking with Gloria he spoke to Alton Eugene Parker, Jr., of the Belvidere police department and that Parker told defendant that he was investigating an allegation that defendant had molested Marilyn.

In rebuttal, the State called Parker and Gloria.  Parker testified that at approximately 7 p.m. on July 6, 2000, he interviewed defendant.  Before asking defendant any questions, Parker read and defendant signed a 
Miranda
 warning and waiver.  Parker then asked defendant if he was aware of an incident between him and Marilyn that occurred the last week of January or the first week of February 2000.  Defendant responded, "What incident[?]" When Parker informed defendant of the specific allegations, defendant denied them.

Gloria testified that in 2000, she was employed as an investigator by DCFS.  Gloria interviewed defendant at approximately 7:35 p.m. on July 6, 2000, regarding Marilyn's allegations.  Defendant denied the allegations.  Following Gloria's testimony, the State rested.  The parties then presented their closing arguments.  The jury returned a verdict of guilty.  The trial court sentenced defendant to four years' imprisonment.  Following the denial of his posttrial motion, defendant appealed.

II.  ANALYSIS

Defendant first contends that he was denied his right to a fair trial when the State was permitted to introduce testimony from J.P. Grace and Paula DiCaprio that they provided counseling to Marilyn after the alleged incident.  We agree. 

Generally, testimony regarding psychiatric treatment is inadmissible.  
People v. Daniels
, 172 Ill. App. 3d 616, 626 (1988).  For instance, in 
People v. Gillman
, 91 Ill. App. 3d 53 (1980), the defendant was convicted of contributing to the sexual delinquency of a child.  On appeal, the defendant asserted that the trial court erred in permitting the prosecution to elicit testimony from the victim that she had undergone psychiatric treatment.  This court determined that such testimony resulted in reversible error because it was irrelevant to the issue of the defendant's guilt or innocence.  
Gillman
, 91 Ill. App. 3d at 60.  We also noted that the testimony constituted an attempt by the prosecution to evoke sympathy on behalf of the victim and prejudice the defendant.  
Gillman
, 91 Ill. App. 3d at 60.  In 
People v. Fuelner
, 104 Ill. App. 3d 340 (1982), the defendant was convicted of rape and armed violence.  On appeal, the 
Fuelner
 court, citing to 
Gillman
, found that the trial court committed reversible error in allowing testimony from the complainant, the complainant's father, and the complainant's treating physician regarding the complainant's suicide attempt and subsequent hospitalization in a psychiatric ward.  See also 
People v. Williams
, 99 Ill. App. 3d 919, 925 (1981).

However, where testimony regarding psychiatric treatment has relevance beyond evoking sympathy from the jury, such testimony is admissible.  
Daniels
, 172 Ill. App. 3d at 626; 
People v. Brown
, 107 Ill. App. 3d 576, 582-84 (1982).  Thus, in 
Brown
, the complainant alleged that the defendant had molested her.  At trial, the State elicited testimony from the complainant that she began psychiatric treatment subsequent to the alleged attack.  On appeal, the reviewing court held that this testimony was proper because it was admitted to rebut defense counsel's false statement that the complainant had been receiving psychiatric treatment prior to the alleged incident.  
Brown
, 107 Ill. App. 3d at 582-84.

Based on our review of the record in this case, we can conceive of no reason for the testimony of Grace and DiCaprio other than to evoke sympathy from the jury and to prejudice defendant.  The essence of the testimony of both witnesses was that Marilyn underwent counseling following the alleged incident.  Neither Grace nor DiCaprio testified about any other matter of substance.  This evidence had no bearing on defendant's guilt or innocence.  Accordingly, we hold that the admission of their testimony constituted reversible error.  See 
Fuelner
, 104 Ill. App. 3d at 351-52; 
Gillman
, 91 Ill. App. 3d at 60-61.

Despite this precedent, the State claims that the testimony of Grace and DiCaprio was properly admitted pursuant to section 115--7.2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115--7.2 (West 2000)).  That statutory provision provides in relevant part:

"In a prosecution for an illegal sexual act perpetrated upon a victim, including but not limited to prosecutions for violations of Sections 12-13 through 12-16 of the Criminal Code of 1961, *** testimony by an expert, qualified by the court relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence."  725 ILCS 5/115--7.2 (West 2000).

We hold that the testimony of DiCaprio and Grace was not admissible under section 115--7.2.  The purpose of section 115--7.2 is to provide for the admission of an expert's testimony concerning whether the victim's behavior is consistent with known syndromes.  
People v. Pollard
, 225 Ill. App. 3d 970, 978 (1992).  Section 115--7.2 does not require the expert to label his or her theory as posttraumatic stress syndrome as long as the expert testifies regarding behavioral patterns typically manifested by victims of sexual abuse.  
People v. Wasson
, 211 Ill. App. 3d 264, 272 (1991); 
People v. Nelson
, 203 Ill. App. 3d 1038, 1041-42, 1046 (1990).  In this case, both DiCaprio and Grace testified regarding their educational background, their experience, and the periods during which they treated Marilyn.  In addition, DiCaprio testified that Marilyn "presented with some very serious trauma reaction symptoms primarily," while Grace testified that her treatment goal for Marilyn was "to minimize the effects of sexual trauma."  This vague testimony suggesting that Marilyn suffered from "trauma" was insufficient to fall within the purview of section 115--7.2.  Notably, neither DiCaprio nor Grace testified concerning behavioral patterns typically manifested by victims of sexual abuse or whether Marilyn's behavior was consistent with known syndromes.

In contrast to the testimony of Grace and DiCaprio is the testimony of Bruce.  Bruce testified not only regarding her educational background and experience, but also about the characteristics of child sexual abuse accommodation syndrome.  Child sexual abuse accommodation syndrome is a recognized and accepted form of posttraumatic stress syndrome.  
People v. Leggans
, 253 Ill. App. 3d 724, 733 (1993); 
People v. Dempsey
, 242 Ill. App. 3d 568, 587 (1993); 
Pollard
, 225 Ill. App. 3d at 976.  We believe that this was the type of testimony contemplated by the legislature in promulgating section 115--7.2.  Thus, unlike the testimony of Grace and DiCaprio, Bruce's testimony was admissible pursuant to section 115--7.2 because Bruce testified regarding the behavioral patterns typically manifested by victims of sexual abuse.

Defendant also argues that the trial court committed reversible error in allowing the State to elicit testimony that Marilyn told Melissa about the alleged incident between her and defendant four months after it happened and that Melissa, in turn, told Barbara.  According to defendant, these statements constituted hearsay and do not fall into any of the recognized exceptions to the rule against hearsay.  We address the issue here because it may arise on remand.

Hearsay evidence is testimony regarding an out-of-court statement offered to prove the truth of the matter asserted.  
In re Marriage of Flannery
, 328 Ill. App. 3d 602, 614 (2002).  
Generally, hearsay is inadmissible.  
People v. Carroll
, 322 Ill. App. 3d 221, 223 (2001).  The primary rationale for the exclusion of hearsay testimony is the inability of the opposition to test the testimony's reliability through cross-examination of the out-of-court declarant.  
People v. Jones
, 273 Ill. App. 3d 377, 385 (1995)
.  Thus, where the declarant is available in court or there is an opportunity to ascertain the veracity of the testimony by cross-examination, there is no hearsay problem.  
People v. Burchette
, 257 Ill. App. 3d 641, 660 (1993); 
People v. Jennings
, 142 Ill. App. 3d 1014, 1027 (1986).  In this case, Marilyn and Melissa, the declarants of the complained-of statements, testified at trial and defense counsel cross-examined the witnesses.  Accordingly, under these circumstances, there was no hearsay problem.  

Finally, defendant urges reversal on the basis that defense counsel's failure to object to certain testimony constituted ineffective assistance of counsel.  Because we reverse defendant's conviction and remand the cause for a new trial on other grounds, we need not consider this issue.

III. CONCLUSION

For the reasons stated above, we reverse the judgment of the circuit court of Boone County and remand the cause for a new trial.

Reversed and remanded.

BYRNE and GILLERAN JOHNSON, JJ., concur.